In re Robert E. GIPE, Debtor,

The OWENSBORO NATIONAL BANK, Plaintiff,

v.

Robert E. GIPE, Defendant.

Bankruptcy No. 91–13034–8P7.
Adv. No. 92–124.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

March 29, 1993.

172

Thomas H. McLain, Jr., St. Petersburg,
FL, for plaintiff.

Charles A. Medearis, St. Petersburg, FL,
for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 7 liquidation case and the matter under consideration is a challenge of the right of Robert E. Gipe (Debtor) to a general discharge and a claim of nondischargeability of a particular obligation owed by the Debtor to the Plaintiff, The Owensboro National Bank (Bank). The Complaint filed by the Bank set forth several claims in five separate Counts.

The claim in Count I is filed pursuant to § 727(a)(2) of the Bankruptcy Code and based on the contention of the Bank that the Debtor transferred assets within one year before the date of filing of his Petition for Relief under Chapter 7 of the Bankruptcy Code with the intent to hinder, delay or defraud creditors of the estate. The properties in question are set forth with specificity in Count I of the Complaint. According to the Bank, the assets were transferred by the Debtor pursuant to a Marital Settlement Agreement (Agreement) dated January 30, 1991, to his former spouse, for less than reasonable consideration and, as a result, he was left with virtually no assets other than his homestead which he claimed as exempt pursuant to Article X § 4 of the Fla. Const. The Bank further alleges in this Count that despite the transfer of these assets to the Debtor's ex-wife, she continued to provide financial support to the Debtor, including paying the major portions of his living expenses, tuition expenses, and all the monthly mortgage payments on his homestead.

The claim set forth in Count II is based on § 727(a)(4) of the Bankruptcy Code. In this Count the Bank alleges that the Debtor committed a false oath in connection with his bankruptcy by omitting from his Schedules of Assets a receivable from a Agreement for Deed with a value of $16,000.00 and a set of golf clubs valued at $500.00. In addition, the Bank contends the Debtor failed to fully disclose the transfers of properties to his ex-wife specifically described in Count I of the Complaint.

The claim of the Bank in Count III is based on § 727(a)(5) of the Bankruptcy Code. In this Count, the Bank alleges that the Debtor failed to satisfactorily explain the loss of assets to meet his liabilities. This contention is based in turn on the allegation that on the Financial Statements submitted by the Debtor to the Bank dated June 1, 1989, he scheduled his total assets valued at $1,291,200.00, yet on his Schedules he listed his total assets consisting of his condo, which he claimed as exempt, and personal property valued at $595.00, and, when called upon, failed to adequately explain the difference between the assets which were available for creditors in June, 1989 and those available on the date he filed his Petition for Relief under Chapter 7, on October 11, 1991.

The claim of the Bank set forth in Count IV of the Complaint involves the dischargeability, *vel non*, of a debt admittedly owed by the Debtor to the Bank in the amount of $576,872.03 plus interest. It is the contention of the Bank that the Debtor executed an assignment of saving account passbook or Certificates of Deposit (CD's) owned by him and his ex-wife jointly, which he assigned on behalf of himself and his ex-wife pursuant to a power of attorney purportedly granted to him by his ex-wife when, in fact, at the time he executed the assignment the power of attorney had been revoked and was no longer valid. Based on these facts, it is the contention of the Bank that as a result of this misrepresentation by the Debtor caused a defective assignment and the Bank lost its collateral which secured a debt in the amount of $70,000.00.

The claim in Count V is based on § 523(a)(2)(B) in which the Bank contends that as a result of the false financial statements made on October 31, 1985, June 1, 1987, and June 1, 1989 in the amounts of $5 million, $3 million, and $2 million respectively, the Bank reasonably relied on the accuracy of these Statements and relying on same made various loans and loan extensions to the Debtor. It is the Bank's contention that these Financial Statements were false and were published with specific intent to deceive the Bank.

In due course, the Debtor filed his Answer. The Answer contained some general admissions but denied all relevant portions of the charges made by the Bank. Just prior to receiving evidence the Bank announced that it would not pursue the claim set forth in Count V and agreed that this claim should be dismissed with prejudice. This left for consideration the claims set forth in Counts I through IV in support of, and in opposition of which, the following facts have been established by testimony and documentary evidence. These facts are as follows:

The Debtor and his ex-wife were married for 37 years. Due to the development of discord in the marriage, the Debtor and his then-wife instituted a dissolution of marriage proceeding in which the Debtor was not represented by counsel but his wife was. In connection with the divorce proceeding, the Debtor and his wife entered into an Agreement designed to divide their joint assets. The Agreement specifically reserved the wife's right to alimony/spousal support for further adjudication, if circumstances warranted a change. (Bank's Exh. # 2). On April 2, 1991, the Circuit Court in and for Pinellas County entered a Final Judgment on the dissolution of marriage and incorporated into ¶ 3, the Agreement arrived at between the parties dated January 30, 1991. (Bank's Ex. # 3). As a result of the Agreement, the Debtor received the following assets:

(a) A condominium located in Clearwater, Florida which the Debtor claims as his homestead. (Bank's Exh. # 1 and 2);

(b) The right to build on a lot located in Owensboro Kentucky valued on the Schedules at $3,500.00. (Bank's Exh. # 1 and 2);

(c) Stock in a corporation known as Knowledge Resources, Inc. valued by the Debtor at no value. (Bank's Exh. # 1 and 2). At the time of the marital settlement agreement, according to the Debtor, Knowledge Resources, Inc. was indebted to him in the amount of $75,000.00. The Debtor claimed that this was uncollectible since Knowledge Resources had no assets.

(d) In addition, the foregoing, the Debtor also retained a race horse which, according to the Debtor's Amended Statement of Financial Affairs, was worth less than $3,000.00. This race horse was transferred by the Debtor in August, 1991 to satisfy an outstanding training bill in the approximate amount of $6,000.00.

(e) The Debtor also retained a membership in the Bellair Country Club, not scheduled as assets, which, according to the Debtor, was non-assignable and had no value.

(f) The Debtor also retained some miscellaneous personal property which at the time of the commencement of the case was valued at $595.00. (Bank's Exh. # 1 and 2).

(g) A 1987 Oldsmobile which the Debtor sold in June, 1991 for $3,000.00.

Pursuant to the Agreement, the Debtor's wife received the following properties:

(a) Rental property located in Owensboro, Kentucky which was sold for $33,970.00 on March 1, 1991. (Bank's Exh. # 2 and 7).

(b) House located at 1723 Oakdale Lane East, Clearwater, Florida which, according to the Debtor's June 1, 1991 Financial Statement had a value of $170,000 with an outstanding mortgage of $95,200. (Bank's Exh. # 2 and 4).

(c) All rights to two commercial properties located in Tampa, Florida which were the sites of two Long John Silver Restaurants. The real estate was leased to an entity known as Jerrico, Inc., which operated three Long John Silvers and paid a monthly lease income at the time of the marital settlement agreement in January, 1991 of approximately $8,500 per month with a remaining lease term of 15 years. The values listed on the Debtor's June 1, 1989 financial statements for those properties totaled $1,150,000.00, with outstanding mortgage indebted-

ness in January, 1991 having a principal balance of $500,000 plus accrued interest. (Bank's Exh. # 2 and 4).

(d) 25,000 shares of stock of Knowledge Resources, Inc., which the Debtor indicated on his bankruptcy schedules had no cash value. (Bank's Exh. # 1 and 2).

(e) IRS refunds which totaled $46,604.67. (Bank's Exh. # 2, 8 and 9).

(f) A membership in Owensboro Country Club which the Debtor valued at $5,000 on his June 1, 1989 financial statement (Bank's Exh. # 2 and 4).

(g) A 1988 Lincoln automobile (Bank's Exh. # 2).

(h) Furniture, jewelry and furs, which the Debtor valued at $210,000 on his June 1, 1991 financial statement, less the furniture received by the Debtor in the settlement agreement which he valued at $500 in his bankruptcy schedules. (Bank's Exh. # 1, 2 and 4).

(i) Rights to joint Certificates of Deposit in an account in Owensboro National Bank. The Debtor testified that the CD's originally consisted of two CD's of $100,000 principal each, which with accrued interest totalled $269,447.86, in March of 1991. (Bank's Exh. # 2).

On October 11, 1991, the Debtor filed his Petition for Relief under Chapter 7 of the Bankruptcy Code. The Schedule filed by the Debtor listed total assets of $109,095.00 versus total liabilities of $1,261,274.00. According to the Statement of Financial Affairs filed by the Debtor, his income at the time of filing was $258.00 per month and his monthly expenses totaled $1,690.00 per month. (Bank's Exh. # 1). It is without dispute that after the marriage was dissolved the Debtor's former wife financially supported the Debtor by paying practically all of his living expenses, tuition expenses, and mortgage payments on his condo, claimed and allowed as exempt. In answering question # 10 on his Statement of Financial Affairs, which required the Debtor to disclose other transfers, the answer furnished by the debtor under penalty of perjury reads as follows:

Debtor quitclaimed deed property (7540 Hillsborough, Tampa, FL) as divorce settlement as required by court order. [sic] (Pltf.Exh. 10)

After the commencement of the case, the Internal Revenue Service (IRS) issued a tax refund check in the amount of $46,604.67 to the Debtor and his ex-wife jointly. The Debtor endorsed the check to his ex-wife in April, 1992. The Debtor's right to a tax refund was not disclosed on his Schedule of Assets and certainly the Debtor did not inform the Trustee of the estate that he received the tax refund check. (Bank's Exh. # 1 and 16). The property in Kentucky which was transferred pursuant to the Agreement to the Debtor's ex-wife was sold. The sale netted approximately $34,-000.00. Notwithstanding, it is without dispute that the Debtor's transfer of this property to his ex-wife permitted the Debtor to close the sale and keep the proceeds of the sale.

In addition, the Debtor loaned $25,000.00 to an individual named Steve Steele (Steele). Although Steele repaid approximately $7,000.00, $18,800.00 remained unpaid at the commencement of this case. The Steele receivable was not listed as an asset on the Schedules filed by the Debtor. It was not until after the Debtor was questioned at the creditors meeting about Steele receivable that the Debtor filed his Amended Statement of Affairs, and Amended Assets Schedule on October 22, 1991. (Bank's Exh. # 7, 11, and 16).

In December, 1990, the Debtor requested the Bank issue a line of credit of $225,-000.00 to the Kentucky Industrial Development Finance Authority (KIDFA). The Debtor pledged two CD's in the face amount of $100,000.00 each, both of which were held by him jointly with his wife. The pledge agreement was signed only by the Debtor, but was purportedly executed also on behalf of his wife personally through a Regular Power of Attorney (REG POA) (Bank's Exh. # 14). The CD's pledged by the Debtor were not only designed to be used as collateral for the letter of credit, but also on all the indebtedness owed by the Debtor to the Bank.

At the time relevant, the Debtor was indebted to the Bank through several different loan transactions. As a result the KIDFA made a demand and drew on the letter of credit. By March, 1991, the two CD's pledged by the Debtor accumulated interest in the amount of $34,723.93, and totalled $269,447.86. At the request of the Debtor, the Bank agreed to permit the Debtor to use portions of the CD's to the extent that the remaining balance was only $70,000.00 which remained pledged under the original pledge agreement.

In March, 1991, the Debtor endorsed the two CD's jointly in his name and his ex-wife's name. Again, the endorsement was only by the Debtor which he signed not only for himself but on behalf of his ex-wife pursuant to the REG POA, indicating again that he had a valid power of attorney from his ex-wife. It appears that the Debtor's ex-wife made a demand on the Bank for the $70,000.00 CD. When the Bank asserted that the CD had been pledged as collateral, the Bank was notified that the power of attorney to pledge the CD had been revoked prior to the pledge and, therefore, the pledge was ineffective. The Bank, rather than getting involved in litigation with the Debtor's ex-wife, released the $70,000.00 CD to her. These are basically the facts relevant to the four remaining claims of the Bank in which the Bank seeks an Order denying the Debtor's general bankruptcy discharge and the Bank's claim that the debt owed by the Debtor in excess of half a million dollars is nondischargeability by virtue of § 523(a)(2)(A).

■ It should be noted at the outset that the burden of proof is placed on the party who interposes a challenge to the Debtor's right to the general discharge or the dischargeability of a specific obligation. The standard of clear and convincing evidence, which was previously the law in this Circuit, see In re Hunter, 780 F.2d 1577 (11th Cir.1986), no longer governs by virtue of a recent decision of the U.S. Supreme Court, Grogan v. Garner, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), which established that the proper standard is a mere preponderance of evidence.

Considering the several claims which remain for consideration, seriatim, it is clear that in order to prevail on the fraudulent transfer claim based on § 727(a)(2), the claim set forth in Count I of the Complaint, it is the burden of the Bank to establish with the requisite degree of proof that the Debtor did, in fact, transfer properties within one year of the commencement of his Chapter 7 case with the specific intent to hinder, delay, or defraud creditors. This record leaves no doubt, and it is admitted by the Debtor, that pursuant to the Agreement he did transfer major portions of his assets to his ex-spouse and there is no question that as a result of the transfer the Debtor was left insolvent and actually a pauper with a monthly income of $258.00 against monthly expenses of $1,690.00. While it is true that the Debtor did retain an interest in a condominium which was claimed and allowed as exempt as his homestead; the right to build on an "Aspenwood" lot in Owensboro, Kentucky; stock in Knowledge Resources, Inc.; a race horse; membership in a country club; personal property valued at less than $6,000.00; and an Oldsmobile automobile, none of these properties has any significant equity. Thus, considering the value of these properties versus the value of the properties transferred to his ex-wife, there is hardly any doubt that the Debtor received less than adequate consideration for the exchange, even taking into consideration the questionable value of obtaining a divorce without extensive and expensive litigation.

■ While it is well established that the intent to hinder, delay, or defraud creditors must be actual intent, it may be inferred from the Debtor's conduct and from all the facts involved in this particular instance. In re Ingersoll, 124 B.R. 116 (M.D.Fla.1991). Over the years substantial case law has developed certain criteria which the courts applied in determining whether or not the transfers in question were fraudulent. These factors are generally referred to as badges of fraud and are as follows: (a) the lack of, or inadequacy of, consideration for the properties trans-

ferred; (b) the existence of a family, friendship, or other close relationship between the transferor and the transferee; (c) the transferor's retention of the possession, control, benefits or use of the properties; (d) the financial condition of the transferor both before and after the transfer took place (i.e. whether the transfer resulted in insolvency); (e) the cumulative effect of these transactions and course of conduct after the onset of financial difficulties, or dependency, or threat of suit by creditors and (f) the general chronology and timing of the transfers in question.

██ The difficulty in this instance stems from the fact that these transfers were not the classic orthodox fraudulent transfers but were made in connection with the dissolution of marriage in which the ultimate determination of the fairness of the Agreement was lodged in a trial court which approved the Agreement and dissolved the marriage. Thus, the Agreement between the parties ordinarily should not be disturbed by this Court and re-examined for fairness. Notwithstanding, the Bank urges that in spite of the acceptance by the trial court of the fairness of the Agreement, the transfers still may be considered to be fraudulent if as a result of a transfer the spouse who transferred the properties is rendered insolvent, *citing Gray v. Snyder,* 704 F.2d 709 (4th Cir.1983); *Britt v. Damson,* 334 F.2d 896 (9th Cir.1964). The fact that in the instant case the wife did not receive any significant award of alimony does not necessarily constitute an equivalent value for the purpose of determining whether the transfer of marital properties did constitute a fraudulent conveyance. *In re Wallace,* 66 B.R. 834 (Bankr.E.D.Mo. 1986).

In *Gray,* the Fourth Circuit Court of Appeals was called upon to consider an attack by the Trustee on the transfer from the debtor to his ex-wife in exchange for the wife's release of marital rights and inheritance. The suit filed by the Trustee was based upon § 548 of the Bankruptcy Code. The Court of Appeals ordered a remand for the purpose of considering whether or not under the applicable law, a separation agreement, as distinguished from a divorce decree, would be valid and enforceable. *Gray* did not deal with a challenge of the debtor's right to a discharge under § 727(a)(2) but rather, an attack by the Trustee on the transfer of property as fraudulent pursuant to § 548 of the Bankruptcy Code.

In *Britt, supra.* the Ninth Circuit considered the right of creditors to challenge a transfer of property as fraudulent, under the laws of the State of Washington. The Court did conclude that if the transfer rendered the husband insolvent, the transfer may be fraudulent under the applicable law of the State.

The matter before this Court is further complicated by the undisputed fact that after the marriage was dissolved the wife was supporting the former spouse and paid practically all the Debtors living expenses, meeting an almost–$1,500.00 shortfall each month, the difference between the claimed monthly income of the munificent sum of $258.00 and the ongoing monthly expenses of $1,690.00.

Clearly, there is no question that if the transfers under consideration were, in fact, not real but sham transfers in that the transferee, i.e., the Debtor, retained effective control over the transferred properties, it would be appropriate to conclude the transaction was tainted and fraudulent and in turn may form the basis for denial of the Debtor's right to a discharge pursuant to § 727(a)(2). However, there is nothing in this record which would warrant a finding that the Debtor, in fact, retained any control over the properties transferred to his ex-wife pursuant to the Agreement and the fact that the wife, apparently out of the goodness of her heart, continued to financially assist her former husband is of itself insufficient to conclude that the transfer was, in fact, a sham and not a real transfer at all.

The fraudulent transfer alleged in this instance is not in support of an attack on the transfer in which the Trustee seeks to set aside pursuant to § 548, but as a basis to deny the Debtor's discharge pursuant to § 727(a)(2) of the Bankruptcy Code. The

crucial difference is that under § 548(2)(B)(i)(ii) to prevail and set aside a transfer, it is not necessary to establish intent, unlike under § 727(a)(2) when intent to hinder, delay or defraud creditors is crucial and is an indispensable element of the claim. There is no evidence in this record that the transfers pursuant to the Agreement were made with actual intent to hinder, delay or defraud creditors, or that the motivation of the Debtor to enter into the transfers were, in fact, not a sham but his desire "to take care of his wife" and was not done with intent to remove the properties from the reach of his creditors. Thus, this Court is satisfied that the claim of the Bank set forth in Count I cannot be sustained and does not form a basis to deny the Debtor's discharge.

■ The claim in Count II is based on § 727(a)(4)(A). To support this claim, there is an implied requirement that the false-hood must have been done knowingly and fraudulently. However, this requirement of the claim based on § 727(a)(4)(A) might be inferred from the general conduct of the Debtor. *In re Ingersoll, supra,* simply because it is not susceptible to direct proof.

It cannot be gainsaid that it is responsibility of the Debtor to make full and complete disclosure to the creditors of all matters which are relevant to the Debtor's rights to a discharge. While some innocent omissions due to oversight and negligence may be excused, numerous omissions, incomplete, and false statements might very well sustain the claim that the debtor did, in fact, commit a false oath in connection with the execution of the Statement of Financial Affairs and Schedule of Assets and Liabilities filed with the Petition for Relief.

■ The failure to schedule an asset of some significance is clearly material and may be indicative of fraudulent intent. *Ingersoll, supra.* It is equally true that responses furnished to the questions on the Statement of Financial Affairs do not provide substitutes for failure to disclose an asset on the Schedule B. While it is true that by virtue of F.R.B.P. 1009 the Debtor has an absolute right to amend his Sched-

ules so long as the case is open, the amendment would not cleanse the original Statements if they are found to be tainted and fraudulent. *In re Muscatell,* 113 B.R. 72 (Bankr.M.D.Fla.1990). The fact that the transfers were neither disclosed originally but revealed only at the § 341 Meeting of Creditors or later by an amendment is of no consequence. It is well established that the Debtor may not hide behind the invisible "cloak of discovery" by claiming that although required information was not originally disclosed, it was disclosed to the Trustee at the Meeting of Creditors.

■ There is no question that creditors are entitled to judge for themselves what will or will not benefit the estate or what will or will not prejudice them and it is not for the Debtor to determine which properties of the estate are worthy and which are not beneficial to the estate. *Muscatell, supra.* It needs no elaborate discussion to point out that when the Debtor signs a Statement of Financial Affairs under penalty of perjury, he certifies that all answers set forth in his Statement were true. The veracity of the Debtor's Statement is absolutely essential to a meaningful administration of his estate. *In re Watkins,* 84 B.R. 246, 250 (Bankr.S.D.Fla.1988); *Diorio v. Kreisler–Borg Construction Co.,* 407 F.2d 1330 (2nd Cir.1969); *Chalik v. Moorefield (In re Chalik),* 748 F.2d 616 (11th Cir. 1984).

■ In the present instance, the major impact on the Debtor's financial condition is the transfer of assets by the Debtor to his ex-wife made pursuant to the Agreement. The Debtor, in his Statement of Financial Affairs referred to this very transaction by merely reflecting a transfer of a Long John Silver restaurant on Hull Avenue in Tampa which he stated was made in accordance with the Court Order. In addition, the Debtor failed to disclose his non-exempt assets. As of this date the Debtor had yet to file an amendment disclosing all properties transferred to his ex-wife pursuant to the Agreement including the CD's totalling $70,000.00 and the I.R.S. refund check in the sum of $46,604.67.

Based on the foregoing, this Court is satisfied that the Bank did, in fact, present persuasive and adequate proof that the Debtor committed a false oath in connection with his bankruptcy, and therefore, his right to the general bankruptcy discharge on this ground should be denied.

Ordinarily, in light of the foregoing, it would be unnecessary to consider the remaining two claims set forth in the Bank's Complaint: one, the alleged failure of the Debtor to explain his loss of assets to meet his liabilities, the claim set forth in Count III of the Complaint; and two, that the Debtor obtained money by false pretenses in connection with the loan obtained by him from the Bank as set forth in Count IV of the Complaint. However, in order to give a fair and full treatment on all the claims, this Court is satisfied that it is appropriate to state the following findings of fact and conclusions of law on these two remaining claims.

There is hardly any doubt that the Debtor had a net worth of more than $3 million not too far removed in time from the date he filed his bankruptcy Petition. It is undisputed that when the Debtor filed his Petition for Relief under Chapter 7 he had a monthly income of $258.00, and a negative cash flow of almost $1,500.00 monthly. There is no question that it is the Debtor's obligation to explain whatever happened to the assets which made up his holdings and which were scheduled on his Financial Statements submitted earlier. However, in this particular instance, the transfer of properties pursuant to the Agreement certainly accounted for and fully explained the disposition of the bulk of the Debtor's assets and the assets he retained were satisfactorily explained.

This leaves for consideration the claim of nondischargeability of a debt owed by the Debtor to the Bank based on § 523(a)(2)(A). The evidence is uncontradicted that the Debtor, in fact, represented to the Bank that he had a valid power of attorney to act on behalf of his wife in connection with the loan transaction when, in fact, he very well knew that the power of attorney had been revoked. There is no question that obtaining a loan which is guaranteed by the Debtor, which guarantee was essentially part of the loan transaction, and which power of attorney to sign on behalf of his wife was relied upon by the Bank, but which was not valid was clearly a false pretense. Therefore, this Court is satisfied that the Bank did sustain its burden and it is appropriate to find the debt owed by the Debtor to the Bank in the amount of $576,872.03 plus interest is nondischargeable by virtue of § 523(a)(2)(A). A Final Judgment will be entered in accordance with the foregoing.