In re Robert Thomas COOMBS, Debtor.

Gary D. GARCIA, Plaintiff,

v.

Robert Thomas COOMBS, Defendant.

Bankruptcy No. 94–06574–B7.
Adversary No. 94–90663–B7.

United States Bankruptcy Court,
S.D. California.

Feb. 23, 1996.

Gary D. Garcia, San Diego, CA, in pro. per.

William L. Johnson, Weeks, Rathbone, Robertson & Johnson, San Diego, CA, for debtor.

## MEMORANDUM DECISION

PETER W. BOWIE, Bankruptcy Judge.

A creditor, Mr. Garcia, has brought an adversary proceeding seeking a judgment denying debtor a discharge under Chapter 7. This proceeding, brought under 11 U.S.C. § 727(a) asks that debtor's discharge be denied pursuant to § 727(a)(2)(A), (a)(2)(B), (a)(4)(A), (a)(4)(B) and (a)(5). The Pretrial Order approved by the Court deleted the allegation under (a)(4)(B) and, at trial, plaintiff abandoned the claim under (a)(5).

This Court has jurisdiction of this proceeding pursuant to 28 U.S.C. § 1334 and General Order No. 312–D of the United States District Court for the Southern District of California. This is a core proceeding under 28 U.S.C. § 157(b)(2)(J).

Subsection (a)(2) of § 727 provides:

(a) The court shall grant the debtor a discharge unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition. . . .

Subsection (a)(4)(A) of § 727 states:

(a) The court shall grant the debtor a discharge unless—

(4) the debtor knowingly and fraudulently, in connection with the case—

(A) made a false oath or account. . . .

▮ It is now generally recognized that a plaintiff must establish the allegations in an action under § 727(a) by a preponderance of the evidence. *In re Cox,* 41 F.3d 1294, 1297 (9th Cir.1994); *In re Lawler,* 141 B.R. 425,

429 (9th Cir. BAP 1992); *In re Shults,* 28 B.R. 395, 396 (9th Cir. BAP 1983); *Matter of Ayala,* 107 B.R. 271, 274 (Bankr.E.D.Cal. 1989); *In re Speece,* 159 B.R. 314, 318 (Bankr.E.D.Cal.1993); *In re Maletta,* 159 B.R. 108, 111 (Bankr.D.Conn.1993); *In re Shah,* 169 B.R. 17, 20 (Bankr.E.D.N.Y.1994); *In re Cross,* 156 B.R. 884, 887 (Bankr.D.R.I. 1993); *In re Schroff,* 156 B.R. 250, 254 (Bankr.W.D.Mo.1993); *In re Metz,* 150 B.R. 821, 824 (Bankr.M.D.Fla.1993); *In re Bodenstein,* 168 B.R. 23, 28 (Bankr.E.D.N.Y.1994); *In re Sausser,* 159 B.R. 352, 355 (Bankr. M.D.Fla.1993); *In re Hoflund,* 163 B.R. 879, 882 (Bankr.N.D.Fla.1993). This Court follows that holding.

▮ At the same time that courts utilize the preponderance standard for weighing the evidence in a § 727 action, they also reiterate that:

[O]bjections to discharge under 11 U.S.C. § 727 are to be literally and strictly construed against the creditor and liberally in favor of the debtor.

*In re Bodenstein,* 168 B.R. 23, 27 (Bankr. E.D.N.Y.1994). See *In re Cox,* 41 F.3d 1294, 1297 (9th Cir.1994); *In re Adeeb,* 787 F.2d 1339, 1342 (9th Cir.1986); *In re Devers,* 759 F.2d 751 (9th Cir.1985); *In re Hoflund,* 163 B.R. 879, 882 (Bankr.N.D.Fla.1993). *In re Adeeb* discusses what, at least in part, that rule of construction means:

Accordingly, discharge of debts may be denied under section 727(a)(2)(A) only upon a finding of actual intent to hinder, delay, or defraud creditors. Constructive fraudulent intent cannot be the basis for denial of a discharge. (Citation omitted.) However, intent "may be established by circumstantial evidence, or by inferences drawn from a course of conduct." (Citation omitted.)

787 F.2d at 1342–43. As a proposition for statutory interpretation, strict construction of exceptions to the favored discharge has application. As a rule to apply to consideration of evidence, it does not.

Plaintiff has asserted that debtor failed to list certain assets in his schedules, thereby concealing them from the trustee and credi-

tors. Specifically, plaintiff alleges that debtor:

1. Concealed ownership of a 401(k) plan.
2. Concealed the receipt of payroll on June 15, 1994.
3. Concealed the true market value of his automobile.
4. Concealed ownership of a burial plot and burial vault.
5. Concealed the true balances in First Interstate Bank Accounts....
6. Concealed and transferred $2889.76 to or for the benefit of James Michael Harper.
7. Concealed ownership of a Chinese rug.
8. Concealed ownership of a dining room set.
9. Concealed and transferred assets by paying rent for July, 1994, in advance, on June 15, 1994, in the amount of $465.00 and by paying for legal services to be performed by Susan Rudoni Chapman, in advance, on June 15, 1994, in the amount of $450.00.

Revised Pretrial Order, p. 8.

Debtor filed a "barebones" petition under Chapter 7 on June 15, 1994. He testified at trial that he filled in the workpapers for the Schedules and Statement of Financial Affairs on or about June 25, 1994. He signed the Declaration, the Statement of Financial Affairs and the Statement of Intention on July 1, 1994. The first meeting of creditors was set for, and held on July 21, 1994.

At the first meeting, plaintiff inquired of debtor about the failure to disclose payment of his salary on June 14 or 15, about the omission of the 401(k) plan, about the market value of the debtor's vehicle, the identity of plaintiff as a co-debtor on the real property loan, and about payments by debtor to Harper. The trustee continued the § 341(a) meeting to August 4, 1994 and directed debtor to amend his schedules. Plaintiff was not permitted at that time to complete his questioning of the debtor. Counsel for debtor asked plaintiff for information about what else plaintiff felt should be listed. Plaintiff declined to disclose whatever other information he had at that time.

On August 3, 1994 debtor filed amendments to his Schedules and Statement of Financial Affairs. In Schedule B he listed wages received of $1,107 added to cash on hand. In item 11 of Schedule B he listed his 401(k) plan, valued at $36,314.08. At item 23, he attempted to correct the valuation of his vehicle, although he confused the response once again. He amended Schedule C to claim the 401(k) plan as exempt, as well as the wages received. In the Statement of Financial Affairs he added information about his income from employment to the petition date in 1994.

At the continued meeting of creditors on August 4, 1994 the trustee had not received the amendments. No testimony was taken and the meeting was concluded. On August 12, 1994 a further amendment was filed, revising the amount of the claim of the real property creditor. On September 2, 1994 plaintiff objected to debtor's claim of exemptions. In part, plaintiff focused on the debtor's vehicle, contending that wholesale Blue Book was $9,100, before additions for options. Subsequently, the case was reassigned to this Court and, on November 7, 1994 debtor was directed to amend his Schedules again. Creditor was given a new 30 day period to object to the revised claim of exemptions.

On December 2, 1994 debtor filed his new amended schedules and Statement of Affairs. These amendments disclosed that debtor had received a $300 security deposit back postpetition. The Chinese rug was added, valued at $250. An end table was added, at $30. A bicycle and Christmas decorations were added and listed as in plaintiff's possession. Their combined value was $170. The value of the car was amended to mid-Blue Book after the Court's determination of a value of $12,150. The cemetery vault and block in Pittsburgh, Pennsylvania was added, valued at $1,150. Schedule C was amended to exempt the Chinese rug, the corrected equity in the car, the bicycle and Christmas decorations, the cemetery vault and block, and a toaster. Schedule F was amended to add plaintiff's mother as an unsecured creditor and Schedule H was amended to show plaintiff as a co-debtor on the real estate loan.

The Statement of Financial Affairs was also amended to show a *lis pendens* recorded and gifts to Michael Harper totalling about $400 in the one year pre-petition. Item 11 was amended to add San Diego Trust & Savings as an institution at which debtor had accounts which had been closed.

Taking each item in turn, the Court will consider the asserted omissions, starting with the 401(k) plan. It is true that neither the existence nor the value of the plan was listed in the original schedules. The subject was raised by the plaintiff at the first meeting of creditors, and the plan was added to Schedule B on the first amendment filed August 3, 1994. Debtor testified at the first meeting, and at trial that he understood the plan was exempt from the reach of creditors. The trustee abandoned any interest in the plan by notice given January 6, 1995.

Receipt of his paycheck for $1,107 on June 15, 1994 was also not originally disclosed in the Schedules. It, too was raised at the first meeting of creditors, and was added in the amendments filed August 3. The trustee also abandoned any interest in it.

The valuation of the automobile took forever to straighten out. In the original Schedules, at Schedule B, the market value "without deducting any secured claim or exemption" was listed as $5,057. Schedule C listed the value also at $5,057. Schedule D, showing secured claims, however, listed $5,057 as the amount of the claim and the value at $9,000. The first amendment to Schedule B revised the value "without deducting any secured claim of exemption" to $3,943, which was clearly taking the $9,000 value and deducting the $5,057 claim, which was the wrong way to answer the query. The next amendment to Schedule B got it right, after the Court had ruled on the objection to claim of exemption for the vehicle. The revised value was $12,150. Debtor testified at the first meeting that the $5,057 value was wrong, that $9,000 was the value based on an unidentified Blue Book. In fact, the wholesale value of the vehicle without adding the options was $9,100.

The burial plot and vault were omitted from the original schedules. They did not come up during the first meeting of credi-

tors, but they were added in the last amendment to Schedule B filed on December 2, 1994, after plaintiff had raised the issue in the adversary complaint. The trustee abandoned all interest in these items, as well.

The issue of the balances of the First Interstate Bank accounts on the date of filing, June 15, 1994, was created by the debtor not working on the Schedules until about June 25, and filing them thereafter. He testified he wrote down the account balances from his check registers at the time he was working on the Schedules, rather than the petition date. At trial, the evidence showed that on the petition date the checking account balance should have been approximately $663, rather than $98, as Schedule B shows. Similarly, the debtor's market interest account showed a higher balance on the petition date than the $135 listed.

Debtor's last amendment to his Statement of Financial Affairs disclosed gifts to Michael Harper aggregating approximately $400 in the year preceding the petition date. Plaintiff introduced evidence of payments by debtor to or for the benefit of Harper that totalled over $2,000. The uncontroverted testimony of both Harper and the debtor revealed that debtor acted as Harper's banker, paid his bills and deposited his checks in debtor's account. Debtor testified that he kept a running balance on an envelope of the monies he advanced or expended on Harper's behalf, and that the net after payments by Harper was around $400.

The Chinese rug was added to Schedule B by amendment filed on December 2, 1994, and valued at $250. The trustee abandoned any interest in it. Debtor testified that the rug had been rolled up and stowed under his bed when he was working on the Schedules, and he just didn't think of it. The amendment came after the filing of the instant adversary proceeding, which alleged the omission of the rug.

Plaintiff has alleged throughout the case the omission of a dining room table and chairs, but in fact they have been continuously listed in and from the original Schedules in Schedule B.

Plaintiff also has alleged the failure of debtor to disclose that on the date his bankruptcy petition was filed, June 15, 1994, he wrote two checks. One was to his landlord to prepay his July rent, something he had not done in earlier months of the leasehold. That amount was $465. The second check was to an attorney in Monterey County to represent him in a Driving Under the Influence case the following week. The debtor testified that he never met the attorney, and that she required payment in advance to appear and plea negotiate for him.

Finally, during the trial, it was revealed that debtor had a checking account at San Diego Trust which was closed in September, 1993, but never disclosed on the Statement of Financial Affairs, or any of the amendments. Debtor did disclose in the last amendment that he had checking and savings accounts at San Diego Trust which were taken over by First Interstate and one was subsequently closed. That amendment came after this adversary proceeding was filed, raising the nondisclosure of any San Diego Trust accounts. However, even the last amendment did not identify the particular checking account closed in September 1993. That came out during the trial.

There is one other factual issue, which relates to the allegations under § 727(a)(2)(B)—that debtor concealed property of the estate after filing the petition. In his original Schedule B, debtor listed as his personal property a $300 security deposit with his landlord. The adversary complaint alleged that he had vacated the premises and not turned over the security deposit. The last amendment to Schedule B set out that the funds had been received back post-petition. The trustee abandoned any interest in it. At trial, debtor, Harper and the building manager testified that Harper was the tenant, but that debtor cosigned on the lease because of Harper's credit problems. Debtor obtained a check from his account to cover the first month's rent and the $300 security deposit, but both debtor and Harper testified that Harper both prepaid and repaid the sums, and that the security deposit was Harper's property. When the debtor later vacated the apartment a check for $378.50 was sent payable to both Harper and debtor. It was endorsed and deposited as a credit to debtor's VISA account. The testimony was that the funds, or their equivalent, were used to pay Harper's bills.

Each of the foregoing items of nondisclosure was also the basis for plaintiff's allegations that in filing his Schedules and Statement of Affairs, and the amendments, and in his testimony during the meeting of creditors, debtor made a false oath in violation of § 727(a)(4)(A).

■ Looking first to plaintiff's allegations of false oaths as violations of § 727(a)(4)(A), courts generally agree:

[T]he plaintiff must prove by a preponderance of evidence that: (1) debtors made a statement under oath; (2) the statement was false; (3) debtor knew the statement was false; (4) debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.

*In re Bailey*, 147 B.R. 157, 162 (Bankr. N.D.Ill.1992); *In re Metz*, 150 B.R. 821, 824 (Bankr.M.D.Fla.1993); *In re Maletta*, 159 B.R. 108, 112 (Bankr.D.Conn.1993).

■ As one court put it:

The purpose of these requirements is to insure that those interested in the case, in particular the trustee, have accurate information upon which they can rely without having to dig out the true facts or conduct examinations. (Citations omitted.) A debtor has an uncompromising duty to disclose whatever ownership interest he holds in property. It is the debtor's role to simply consider the question carefully and answer it completely and accurately. (Citation omitted.) Even if the debtor thinks the assets are worthless he must nonetheless make full disclosure. (Citation omitted.) In completing the schedules it is not for the debtor to pick and choose [sic] which questions to answer and which not to. Indeed, the debtor has no discretion— the schedules are to be complete, thorough and accurate in order that creditors may judge for themselves the nature of the debtor's estate. (Citation omitted.)

*In re Lunday,* 100 B.R. 502, 508 (Bankr. D.N.D.1989); *In re Haverland,* 150 B.R. 768, 770 (Bankr.S.D.Cal.1993); *In re Maletta,* 159 B.R. 108, 112 (Bankr.D.Conn.1993).

■■■■■ Two of the indispensable elements of a cause of action under § 727(a)(4)(A) are fraudulent intent and materiality. It is generally recognized that:

A plaintiff can rarely produce direct evidence of fraudulent intent; the requisite actual intent to defraud may therefore be established through proof of sufficient "badges of fraud." (Citation omitted.) Such badges of fraud include reservation of rights in or the beneficial use of the transferred assets; inadequate consideration; close friendship or relation to the transferee; the financial condition of the transferor both before and after the transfer; and " 'the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors.' " (Citation omitted.)

[W]here there has been a pattern of falsity, or a "cumulative effect" of falsehoods, a court may find that [fraudulent] intent has been established.

Likewise, a court may infer fraudulent intent under Code § 727(a)(4)(A) from a debtor's reckless indifference to or cavalier disregard of the truth.

*In re Maletta,* 159 B.R. 108, 112 (Bankr. D.Conn.1993); *In re Gipe,* 157 B.R. 171, 176–77 (Bankr.M.D.Fla.1993); *In re Metz,* 150 B.R. 821, 824 (Bankr.M.D.Fla.1993). However:

The denial of a discharge under 11 U.S.C. § 727(a)(4)(A) cannot be imposed where the false statement was the result of a simple or honest mistake or inadvertence. (Citations omitted.) Rather, to sustain an objection to discharge under 11 U.S.C. § 727(a)(4)(A), the debtor must have willfully made a false statement with intent to defraud his creditors. (Citation omitted.)

*In re Bodenstein,* 168 B.R. 23, 32 (Bankr. E.D.N.Y.1994). Similarly, "material misstatements, absent fraudulent intent, do not warrant denial of a discharge under § 727(a)(4)(A). . . ." *In re Parsell,* 172 B.R. 226, 231 (Bankr.N.D.Ohio 1994).

■■■■■ In reviewing the many published decisions which have considered whether the debtor should be denied a discharge, this Court has been troubled by some which conclude a discharge should be denied but do not explain how they found the requisite fraudulent intent. It bears repeating that an essential element under § 727(a)(4)(A) is that debtor acted with an actual intent to defraud. To be sure, that intent may be proven by circumstantial evidence. *In re Devers,* 759 F.2d 751, 753–54 (9th Cir.1985); *In re Schroff,* 156 B.R. 250, 254 (Bankr.W.D.Mo. 1993). And it may be inferred from all the surrounding circumstances. *Ibid.* But there must be specific facts or circumstances which point toward fraud. The court, in *In re Smith,* 161 B.R. 989, 991 (Bankr.E.D.Ark. 1993) observed:

First, the debtor's actual intent must be found as a matter of fact from the evidence presented. Of course, the objecting party must generally rely on a combination of circumstances which suggest that the debtor harbored the necessary intent. The Court may then draw an inference from this *evidence.* (Emphasis added.)

Some courts have stated: "The fact that numerous major assets were omitted will alone satisfy the requirement that such omissions be knowing and fraudulent."

*In re Schroff,* 156 B.R. 250, 256 (Bankr. W.D.Mo.1993); *In re Shah,* 169 B.R. 17, 21 (Bankr.E.D.N.Y.1994). More than one court has opined:

The Debtor's numerous omissions in his Statement of Financial Affairs and Schedules, taken together may constitute a pattern demonstrating a reckless disregard for the truth. (Citation omitted.) This reckless disregard for the truth is widely recognized as the equivalent to fraudulent intent. (Citation omitted.)

*In re Metz,* 150 B.R. 821, 824 (Bankr. M.D.Fla.1993). Such conclusory statements are of little use to a court trying to determine whether the requisite fraudulent intent exists in a particular case. Competent facts placed in evidence must point toward that

fraudulent intent. If no facts point toward fraudulent intent, it cannot be found simply by cumulating the number of omissions. Neither sloppiness nor an absence of effort by the debtor supports, by itself, an inference of fraud. Courts which hold otherwise are simply devising a court-made prophylactic rule that the debtor must make substantial effort to provide accurate and complete schedules. Had the Congress intended to make such a rule, it could have done so easily, as it did with § 727(a)(3) (failure to keep adequate books and records), and (a)(5) (failure to adequately explain the loss of assets), neither of which have an express element of fraudulent intent. *In re Bodenstein,* 168 B.R. 23, 33 (Bankr.E.D.N.Y.1994). But the Congress did not do so, and it is not for the courts to create new bars to discharge under § 727(a), or to so distort a requisite element as to make it no element at all.

 The essential point is that there must be something about the adduced facts and circumstances which suggest that the debtor intended to defraud creditors or the estate. For instance, multiple omissions of material assets or information may well support an inference of fraud if the nature of the assets or transactions suggests that the debtor was aware of them at the time of preparing the schedules and that there was something about the assets or transactions which, because of their size or nature, a debtor might want to conceal. For instance, in *In re Chalik,* 748 F.2d 616, 618–19 (11th Cir. 1984), the debtor failed to disclose dealings with twelve corporations of which he was the sole or controlling shareholder and which had $2.1 million in assets and $250,000 per month in income. The court in *In re Aboukhater,* 165 B.R. 904, 910 (9th Cir. BAP 1994) looked to the substantiality of the omission to support an inference of an intent to defraud. In other words, is there something about the omitted asset or transaction which a debtor might want to avoid disclosing. That is why the so-called badges of fraud are utilized to discern intent. *In re Woodfield,* 978 F.2d 516, 518 (9th Cir.1992); *In re Gipe,* 157 B.R. 171, 176–77 (Bankr.M.D.Fla.1993). Another court has called them "factors to consider". *In re Schroff,* 156 B.R. 250, 254–55 (Bankr. W.D.Mo.1993).

A number of courts have considered the concept of materiality. Most cited is *In re Chalik,* 748 F.2d 616, 618 (11th Cir.1984). There, the court concluded:

> The subject matter of a false oath is "material," and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.... The recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted or falsely stated information concerned a worthless business relationship or holding; such a defense is specious. (Citation omitted.) It makes no difference that he does not intend to injure his creditors when he makes a false statement. Creditors are entitled to judge for themselves what will benefit, and what will prejudice, them. (Citations omitted.) The veracity of the bankrupt's statements is essential to the successful administration of the Bankruptcy Act. (Citation omitted.)

The court in *In re Bailey,* 147 B.R. 157, 162–63 (Bankr.N.D.Ill.1992), reiterated the foregoing, and added several observations. Quoting from *Matter of Yonikus,* 974 F.2d 901 (7th Cir.1992), the *Bailey* court stated " '[d]ebtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or unavailable to the bankruptcy estate.' " The *Bailey* court continued: "This is because '[t]he bankruptcy court, not the debtor, decides what property is exempt from the bankruptcy estate.' "

The *Bailey* court then wrote at length:

> 10. Debtors in Chapter 7 proceedings have an affirmative duty to disclose on their schedules of assets whatever ownership interest they hold in any property, inclusive of all legal and equitable interest in said property, as of the commencement of a bankruptcy case. (Citations omitted.) The purpose behind 11 U.S.C. § 727(a)(4) is to enforce debtors' duty of disclosure and to ensure that the debtor provides reliable information to those who have an

interest in the administration of the estate. (Citations omitted.) "Bankruptcy Trustees lack the time and resources to play detective and uncover all the assets and transactions of their debtors." Since § 727(a)(4) relates to the discovery of assets and enforces debtors' duty of disclosure, an omission can be material, even if the creditors were not prejudiced by the false statement. (Citations omitted.)

11. Allowing debtors the discretion to not report exempt or worthless property usurps the role of the trustee, creditors, and the court by denying them the opportunity to review the factual and legal basis of debtors' claims. It also permits dishonest debtors to shield questionable claims concerning an asset's value and status as an exemption from scrutiny. Therefore, the mere fact that unreported property is thought to be worthless or exempt is not a per se defense in a § 727(a)(4) action to bar discharge.

12. However, while the assertion that property is worthless or exempt is not a per se defense, it is a factor in determining materiality, and several courts have found minor omissions from debtors' schedules of assets to be immaterial.

See *In re Cross,* 156 B.R. 884, 889 (Bankr. D.R.I.1993); *In re Gipe,* 157 B.R. 171, 178 (Bankr.M.D.Fla.1993); *In re Haverland,* 150 B.R. 768, 771–72 (Bankr.S.D.Cal.1993).

■■■ This Court holds the opinion that there is little that will prove to be immaterial for purposes of required disclosure if it aids in understanding the debtor's financial affairs and transactions. However, the "size and status of the omitted assets" is directly relevant to determining the debtor's intent and whether it was fraudulent. The distinction between the prophylactic and inclusive concept of materiality in disclosure should not blur the separate requirement of an actual intent to defraud.

■■■ Assessing the omissions in the instant case, the Court finds a number of them to be material. Specifically, omission of the 401(k) plan, the closed account at San Diego Trust, the payments to Discover and the payments to or for Harper are all material. The pay check, the cemetery vault and block,

the Chinese rug, the correct account balances on the filing date, and the correct value of the vehicle are not material. The advance payment of the July rent and the payment to the Monterey attorney are material in the informational sense, but arguably not required to be disclosed in the Statement of Affairs, question no. 3, because each was less than $600. *See* 11 U.S.C. § 547(c)(8).

■■■ Having determined that certain omissions were material within the requirement of § 727(a)(4)(A), the remaining issue is whether plaintiff has met his burden of proving debtor's fraudulent intent. As already noted, that intent may be inferred from all the circumstances surrounding the matter. *In re Parsell,* 172 B.R. 226, 231 (Bankr. N.D.Ohio 1994). But there must be facts which point toward fraud. The debtor has testified that he understood that creditors could not look to his 401(k) plan because of information his employer put out. More than one court has indicated that a debtor need not disclose the existence of non-estate property, such as a spendthrift trust. *In re Aboukhater,* 165 B.R. 904, 910–11 (9th Cir. BAP 1994). The 401(k) plan was ultimately exempt and abandoned by the trustee. There is no evidence concerning any amount in the bank account at or prior to closing that suggests why the debtor would not disclose it. Moreover, the debtor testified that the bank where he had had the account was taken over by another bank and some accounts did transfer to the successor, and were disclosed. The banking relationship between debtor and Harper is not a model for emulation, but was uncontroverted, and credible. Nothing about the timing, the amount, or the fact of the payments to Discover suggests an intent to defraud or any reason not to disclose the payments. The same is true for each of the non-material omissions. Nothing about any of them, individually, or considered together suggest any intent to defraud. If materiality were the only test, the preferred prophylactic rule would warrant a denial of discharge because there were multiple material omissions relevant to understanding debtor's financial affairs. However, plaintiff has provided no direct evidence of actual fraud and the record of evidence

does not support an inference of fraudulent intent.

■ No evidence has been provided about the specific omissions in terms of their nature, size, or otherwise which points this Court toward a finding of fraudulent intent. None of the badges of fraud have been demonstrated. There is no showing that debtor has retained any secret interest in undisclosed transfers, or that debtor received inadequate consideration for them (except as to the gifts to Harper). There is no showing that the transfers were made in anticipation of any impeding or pending lawsuit, although a suit was pending. There was no showing that any transfer significantly depleted the debtor's assets, or that substantially all the debtor's property was transferred. Nor was there evidence as to the secrecy of any conveyance, or that the pattern or cumulative effect of debtor's transactions, and failure to disclose them suggests any intent to defraud. Careless or sloppy preparation of schedules, although an impediment to proper and efficient administration of the Chapter 7 estate, do not support denial of a discharge under § 727(a)(4)(A) absent a supportable inference of fraudulent intent. *In re Ziegler,* 156 B.R. 151, 156 (Bankr.W.D.Pa.1993). This Court finds no such intent. Accordingly, plaintiff has failed to meet his burden of proof under § 727(a)(4)(A).

■ Turning now to the allegations under § 727(a)(2)(A), many of the elements are similar. Specifically:

To deny a discharge under this section, the court must find that the Debtors harbored actual intent to hinder, delay or defraud a creditor or officer of the estate.... We may infer the intent from the circumstances surrounding the transaction.

*In re Woodfield,* 978 F.2d 516, 518 (9th Cir. 1992); *In re Davidson,* 164 B.R. 782, 785 (Bankr.S.D.Fla.1994), *modified on other grounds,* 178 B.R. 544 (Bankr.S.D.Fla.1995); *In re Schroff,* 156 B.R. 250, 254–55 (Bankr. W.D.Mo.1993); *In re Smith,* 161 B.R. 989, 991 (Bankr.E.D.Ark.1993). Again, actual fraud is required. *In re Devers,* 759 F.2d 751, 753–54 (9th Cir.1985). As already discussed, plaintiff has not provided direct evidence of an intent to defraud and the totality of the circumstances do not warrant or support an inference of an intent to hinder, delay or defraud. Accordingly, plaintiff has failed to meet his burden of proof sufficient to deny debtor a discharge under § 727(a)(2)(A).

■ The remaining count is under § 727(a)(2)(B) regarding the $300 security deposit listed in the first two versions of Schedule B as property of the debtor. The testimony of Harper, the landlady, and debtor established that Harper was the original and lone lessee, but that debtor co-signed for him. Debtor also acted as Harper's banker and obtained the $740 cashier's check which was given to the landlady as Harper's security deposit and first month's rent. It is undisputed that debtor listed the security deposit as his, and that most of the security deposit and a rent rebate was given to Harper and debtor jointly in a check. Further, that check was credited to debtor's VISA account, but Harper testified it was his money and the credit to debtor's account was for payment of certain bills for Harper. That evidence was not controverted. Given the record in this case, the Court is unable to find by a preponderance of the evidence that the security deposit was property of the estate under 11 U.S.C. § 541. Because it was not property of the estate, plaintiff cannot show a violation of § 727(a)(2)(B) requiring the denial of a discharge. The Court need not reach the question of whether failure to turn over a $300 security deposit is itself sufficient to warrant denial of a discharge under § 727(a)(2)(B). See *Matter of Ayala,* 107 B.R. 271 (Bankr.E.D.Cal.1989).

CONCLUSION

For all the foregoing reasons, the Court concludes that plaintiff has failed to establish that debtor should be denied his discharge under 11 U.S.C. § 727(a)(2)(A), (a)(2)(B) or (a)(4)(A). Accordingly, counsel for debtor shall prepare and lodge within fifteen (15) days of the date of entry of this Memorandum Decision a separate form of judgment.

Because judgment in this proceeding shall enter in favor of defendant, the companion

adversary proceeding brought under 11 U.S.C. § 523(a) remains viable. The Court shall set a further status conference in that matter by separate notice to the parties.

IT IS SO ORDERED.