In re Walter H. HAMMEKEN and
Patricia L. Hammeken,
Debtors.

Clarence Clark, III, Plaintiff,

v.

Walter H. Hammeken and Patricia
L. Hammeken, Defendants.

United States of America, Plaintiff,

v.

Walter H. Hammeken and Patricia L.
Hammeken, et al., Defendants.

Bankruptcy No. 0–02–00536–EWH.
Adversary No. 02–00042.

United States Bankruptcy Court,
D. Arizona.

Sept. 22, 2004.

Barton L. Baker, Esq., Yuma, AZ, for Walter and Patricia Hammeken.

Estela O. Pino, Esq., Pino & Associates, Sacramento, CA, for Clarence Clark, III.

G. Patrick Jennings, Esq., U.S. Department of Justice—Tax Division, Washington, DC, for the United States.

## MEMORANDUM DECISION

HOLLOWELL, Bankruptcy Judge.

### I. *INTRODUCTION*

The Debtors claim that they have no interest in certain property consisting of two houses, a mobile home and a red Corvette. The evidence, however, demonstrated that they are, in fact, the owners of everything except the red Corvette. The Debtors also failed to accurately and completely fill out their schedules and statement of financial affairs. Accordingly, they are not entitled to a discharge of their

debts. The reasons for these conclusions are addressed in the balance of this decision.

## II. *BACKGROUND FACTS*

Walter and Patricia Hammeken ("Debtors") are the parents of four adult children: Leann, Walter Jr., Donald, and Darren. Leann, in turn, is the mother of Presley Ann Prieto, now seven years of age.

Walter is an electrical processor engineer who once worked for Atari. In June of 1996, the Debtors purchased a California winery in a bankruptcy sale. Title to the winery was held in the name of Lost Hills California Wineries Inc. ("Winery"). In September of 1996, the Debtors sold their residence and an adjacent hydroelectric facility both located in Potter Valley, California, for close to one million dollars. The Debtors reported a gain on the sale of their home of $320,000, but did not include that amount in their taxable income for 1996. The Debtors' 1996 returns reported only a minimal gain on the sale of the hydroelectric facility.

In 1997, the Debtors filed a short form gift tax return indicating that they had given a gift of $20,000 to each of their children. On January 12, 1997, the four children and the Debtors signed an agreement which provided that all of the gifted funds would be held in an account until the children collectively agreed on how to invest the money. While the short form gift tax return states that the gift was made by cash or check, no money was ever transferred to the children and no bank account was set up in their names. Instead, the Debtors held the money, and in March of 1998, the children agreed to lend the Debtors the $80,000 for two years.

In October of 1998, the Debtors sold the Winery for almost one million dollars. The Debtors did not, however, report any income from the Winery sale on their 1998 Tax Form 1040. According to the Debtors, they only lost money on the Winery.

In the spring of 1999, the Debtors transferred over $300,000 to an off-shore bank account in Nassau. The Debtors, at or about the same time, opened up an off-shore MasterCard account with a trust company also based in Nassau. The Debtors then used their off-shore charge account for living expenses and to buy goods at stores like Home Depot. The international credit card balances were paid from funds in the Debtors' Nassau bank account.

In 2000, the IRS undertook an audit of the Debtors' 1998 and 1999 tax returns. That audit resulted in an assessment against the Debtors in excess of $500,000.

On May 22, 2002, the Debtors filed a joint bankruptcy petition ("Petition") in Yuma, Arizona. In their Petition and schedules, the Debtors: (a) listed the Winery as their only address for the previous two years; (b) listed their assets as consisting of $8,250 in personal property and no real property; and (c) listed Hammeken as the only name used by Debtors in the previous six years.

## III. *PROCEDURAL HISTORY*

On August 23, 2002, Clarence Clark III ("Clark") filed Adversary 02–42, Objecting to Discharge of the Debtors pursuant to 11 U.S.C. § 727 ("Clark Complaint"). The Clark Complaint sought a determination that the Debtors were not entitled to a discharge pursuant to 11 U.S.C. § 727(a)(2), (a)(3), (a)(4), and (a)(5).

On August 23, 2002, the United States of America ("United States") filed Adversary 02–43, Objecting To Discharge of the Debtors and for a Determination That Tax Debts Are Excepted From Discharge ("USA–1 Complaint"). The USA–1 Com-

plaint objected to the discharge of the Debtors on the grounds they had failed to satisfactorily explain the loss of more than two million dollars in assets and that they failed to maintain records from which their actions could be ascertained.

On or about October 29, 2002, the United States filed a Complaint for Declaratory And Injunctive Relief (Adversary 02–06) against the Debtors and others[1] ("USA–2 Complaint"). In the USA–2 Complaint, the United States alleged that in the course of investigating the facts relating to the USA–1 Complaint, it discovered evidence that the Debtors owned certain assets that were not listed in the Bankruptcy Schedules as follows:

1. real property located at 43–820 Marigold, Palm Desert, California ("Marigold");

2. real property located at 44–458 San Juan Avenue, Palm Desert, California ("San Juan");

3. a mobile home at 68–870 Victoria, Cathedral City, California (Decal number LBA A4508) ("Mobile Home");

4. two (2) Corvette automobiles;

5. a 1990 white Chevrolet automobile; and

6. automobile engines.

The USA–2 Complaint alleges that title to Marigold and the Mobile Home was held by the Debtors using false names, including but not limited to: Zantel T. Sanamento; June V. Sagewood, June V. Sagewoed, Pat Rodota, and Dorothy Rosella. The United States also alleged that San Juan, held in the name of Presley Ann Prieto, the minor granddaughter of the Debtors, was, in fact, property of the Debtors.

On November 19, 2002, in connection with the USA–2 Complaint, a preliminary injunction was issued with the Debtors' consent, prohibiting the Debtors and the other Defendants from dissipating, transferring, assigning, conveying, encumbering or otherwise disposing of the properties listed in the USA–2 Complaint.

An order was entered on April 11, 2003 consolidating the Clark, USA–1 and USA–2 Complaints. On December 3, 2003, an order was issued setting a trial on the issue of whether the Debtors had violated 11 U.S.C. § 727 by not listing all of their assets on their bankruptcy schedules. All other matters raised by the Complaints have been bifurcated to be determined, if necessary, at a later time.

By the date of the trial, the parties had agreed in their Joint Pretrial Statement that the matter to be determined was whether the Debtors had failed to disclose their ownership interest in Marigold, San Juan, the Mobile Home and a red Corvette (collectively, the "Undisclosed Assets").

Trial commenced on Friday, February 20, 2004 and was continued to April 5, 2004. At the conclusion of the trial, the parties were given 60 days to submit closing statements and post-trial briefs. By request of the parties, the deadline to file post-trial briefs was extended a number of times. All parties have now filed their post-trial briefs and the matter is ready for decision.

## IV. STATEMENT OF JURISDICTION

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), (I) and (J).

## V. ISSUES TO BE DECIDED

A. Did the Debtors conceal their ownership interest in the Undisclosed Assets?

---

1. The "others" include June V. Sagewoed or Sagewood and Zantel T. Sanamento.

B. Did the Debtors make false oaths in connection with their bankruptcy case?

## VI. *LEGAL STANDARD UNDER § 727*

### A. *Burden of Proof*

■■ Parties objecting to discharge based on alleged fraudulent concealment or false oaths must prove by a preponderance of the evidence that the debtors have engaged in such action. *In re Cox*, 41 F.3d 1294, 1297 (9th Cir.1994); *In re Coombs*, 193 B.R. 557, 560 (Bankr.C.D.Cal. 1996). While the objecting party has the ultimate burden of persuasion, once it has presented sufficient evidence of concealment or that the debtor intentionally failed to disclose information, then the burden shifts to the debtor to provide a credible explanation to overcome the inference. *In re Lawler*, 141 B.R. 425, 429 (9th Cir. BAP1992); *In re Prevatt*, 261 B.R. 54 (Bankr.M.D.Fla.2000); *In re Smith*, 278 B.R. 253 (Bankr.M.D.Ga.2001).

### B. *Legal Standard for Denial of Discharge Under § 727(a)(2)*

Section 727(a)(2) allows the court to deny the debtor a discharge if, the debtor with intent to hinder, delay or defraud a creditor has transferred, removed, destroyed, or concealed, or has permitted to be transferred, removed, destroyed or concealed, property, within one year of filing or after filing the bankruptcy petition.

■ Two elements comprise an objection to discharge under § 727(a)(2)(A): a disposition of property, such as transfer or concealment; and, a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act of disposing of the property. *In re Beauchamp*, 236 B.R. 727, 732 (9th Cir. BAP 1999). *In re Lawson*, 122 F.3d 1237, 1240 (9th Cir. 1997).

■■ A denial of discharge is appropriate only where the creditor has shown the debtor has actually intended to hinder delay or defraud creditors. However, intent can be established by circumstantial evidence or by inferences drawn from a course of conduct. *In re Wills*, 243 B.R. 58, 65 (9th Cir.BAP1999).

### C. *Legal Standard for Denial of Discharge Under § 727(a)(4)*

■ A debtor is denied a discharge if the debtor knowingly and fraudulently, in connection with the case, made a false oath or account. § 727(a)(4). The plaintiff must prove that (1) the debtors made a statement under oath; (2) the statement was false; (3) the debtors knew the statement was false; (4) the debtors made the statement with fraudulent intent; and, (5) the statement related materially to the bankruptcy case. *In re Coombs*, 193 B.R. 557, 563 (Bankr.C.D.Cal.1996); *In re Wills*, 243 B.R. 58, 62 (9th Cir. BAP 1999).

■■ Since a plaintiff can rarely produce direct evidence of fraudulent intent, the requisite actual intent to defraud may be established through circumstantial evidence drawn from the debtors' conduct and "badges of fraud," including (1) the reservation of rights in or the beneficial use of the transferred assets; (2) inadequate consideration; (3) close friendship or relation to the transferee; (4) the financial condition of the transferor, both before and after the transfer; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt; and, (6) the onset of financial difficulties or pendency or threat of suits by creditors. *In re Coombs*, 193 B.R. at 564. Thus, a court may find fraudulent intent is established where there is a cumulative effect of falsehoods.

## VII. ANALYSIS OF EVIDENCE REGARDING THE UNDIS-CLOSED ASSETS

I turn now to an analysis of the evidence regarding each of the Undisclosed Assets. The evidence as presented by the Debtors is summarized, followed by an analysis of the controverting evidence presented by the Plaintiffs.[2] Because the evidence with respect to Marigold and San Juan is inter-linked, those two properties will be considered together.

### A. Marigold and San Juan Properties

██ Donald Hammeken and his sister, Leann, testified that in 1999, the Hammeken children became concerned about the possible dissipation of their $80,000 gift because of their parents' heavy drinking and frequent visits to casinos. Donald, who was unemployed at the time, was dispatched by his siblings to retrieve the gift money and was directed to invest it in real property for the benefit of all of the Hammeken children. Donald testified that the children wanted to invest the money in real property because they believed it would be difficult for the Debtors to ask to borrow the money back if it were placed in an illiquid investment.

Donald testified that he succeeded in obtaining $75,000 of the $80,000 gift from his mother in the form of three cashier's checks dated September 24, 1999. The cashier's checks were made out in Patricia's maiden name of Rodota, and drawn on a Reno bank account maintained in that name.[3] Donald testified that the cashier's checks were then deposited by him into an escrow with Dixie Escrow in Palm Desert, California and used to pay the purchase price for Marigold. On November 10, 1999, a real property deed was recorded transferring title of Marigold to Donald.

Donald testified that he located Marigold with the assistance of Paul Mamika ("Mamika"), who worked with his parents at the Winery. Donald testified that Mamika's girlfriend introduced him to a June Sagewood or Sagewoed ("Sagewood"), who shortly thereafter, became his girlfriend. However, Donald did not know exactly where Sagewood worked or lived during the time of their relationship. He testified he believed she made "good money" as a relaxation seminar instructor, that she traveled a lot and that she was Canadian. Donald identified Sagewood in a photograph. His testimony was corroborated by Leann who identified the woman in the same photograph as Sagewood. However, no non-Hammeken family member identified Sagewood in the photograph or testified that they ever met Sagewood. Sagewood was not called as a witness by the Debtors, who, at the time of trial, claimed that they had no idea of her whereabouts.

Donald, Leann and Walter all testified that Marigold was uninhabitable when Donald acquired it because it did not have a toilet or an operating shower. Both Donald and Leann testified that when Leann came to Palm Desert to inspect Marigold, she became very upset about its dilapidated condition. Leann testified that

---

2. Unfortunately, even a summary of the evidence is lengthy, given the conflicting testimony and convoluted facts of the case.

3. The Debtors testified that the source of the money in the Reno bank account was a transfer of funds from the Nassau bank account, but produced no documentary evidence to support that testimony. The Debtors also claimed they were unable to obtain any documents related to the Nassau accounts and, therefore, could not comply with the Plaintiffs' discovery requests for records regarding those accounts. There was, therefore, no documentary evidence presented about what happened to the funds in the Nassau account after 1999.

after she discovered the condition of Marigold, the Hammeken children decided it should be sold and the sale proceeds used to buy a better property. Leann further testified that she located San Juan and that the Hammeken children agreed to acquire San Juan with the proceeds generated by a sale of Marigold. However, no evidence was presented that Donald ever put Marigold on the market. In November of 2000, approximately one year after he took title to Marigold, Donald transferred the title to Sagewood.

In somewhat conflicting testimony, Donald testified that he and Sagewood were looking for property to invest in and that *they*, not Leann, located San Juan as a possible investment. He testified that an escrow was opened on San Juan with $90,000 in cash provided, almost exclusively, by Sagewood. Despite the fact that Sagewood purportedly provided most of the money for the acquisition of San Juan, the escrow was opened in Donald's name. Also, despite Sagewood's purported $90,000 investment at the closing, in January of 2000, title to San Juan was put in the name of Leann's daughter, Presley A. Prieto, then aged 3.

In February of 2000, Leann signed her daughter's name on a $90,000 deed of trust encumbering San Juan in favor of Donald. Leann testified that a deed of trust was put on San Juan to protect her siblings from a transfer of San Juan by Leann without their siblings' consent. She admitted that no funds were loaned by Donald to Presley, and that notwithstanding the notarization of the deed of trust, Leann, not her three year old daughter, signed it.

Donald testified that when his relationship with Sagewood began to "hit the rocks," in late 2000, they agreed he should transfer Marigold to her in order to make sure she was compensated for her $90,000 investment in San Juan. In November 2000, Donald transferred Marigold to Sagewood. Two weeks later, Donald married someone else. He and his new wife lived at San Juan for the next two and one-half years.

Donald and Walter testified that Walter worked on improving Marigold, both before and after title was transferred to Sagewood. Walter testified that he was never compensated for any of the work he did on Marigold and that Sagewood owed him money on the petition date. However, there is no listing in the bankruptcy schedules of an obligation due from Sagewood to the Debtors.

The Plaintiffs presented evidence that Sagewood's name could not be found in any database and that none of Donald's neighbors on San Juan recalled meeting her. The Plaintiffs also produced evidence that Darren Hammeken had failed to list, in his bankruptcy schedules filed in January of 2000, any equitable ownership interest in Marigold even though he listed a vehicle as being located at Marigold.

The Plaintiffs offered testimony from one of Donald's neighbors that Walter said that the Debtors owned Marigold. The Plaintiffs also offered testimony from the individual living next door to Marigold, asserting that the Debtors physically moved into Marigold in September of 2000 and moved out in September of 2002. Walter told this same neighbor that the Debtors owned Marigold. That neighbor testified that Walter made numerous improvements to Marigold including building an outside wall around the property.

The Plaintiffs called Mamika as a witness. Mamika testified that he worked as an independent contractor for the Debtors at the Winery but denied that he helped Donald locate Marigold. Mamika also testified that he had never been to Palm Desert, California. Mamika could not

identify the picture of Sagewood and denied that his girlfriend introduced Sagewood to Donald. Finally, Mamika testified that notwithstanding the fact that the phone bill and/or the electric bill at both Marigold and San Juan were put in his name, after being acquired by Donald Hammeken and Presley Prieto, Mamika never gave permission to put any utilities at either property in his name.

The Plaintiffs also offered into evidence the entire file from Dixie Escrow on the acquisition of Marigold. Those documents indicate that there was a broker, Lupe Salcido, involved in the transaction. On cross-examination, Donald first stated that no broker was involved in the Marigold purchase. Then, when asked about whether Lupe Salcido had been the broker, he agreed that "she" was the broker. However, the Plaintiffs produced deposition testimony of the Dixie Escrow officer, indicating that Lupe is a man, not a woman.

Donald testified that a broker was also used in the San Juan acquisition, but that Sagewood dealt with the broker more than he did. The Plaintiffs called the broker, Lou Boxer, as a witness. Mr. Boxer testified that he negotiated the purchase of San Juan with Walter and could not recall Donald being involved or ever meeting Sagewood.

The Plaintiffs point out that Sagewood was not called to testify at trial, and assert that the failure of the Debtors to produce her as a witness supports the Plaintiffs' claim that she does not exist, but was just a name made up by the Debtors to disguise their ownership interest in both Marigold and San Juan. The Plaintiffs argue that it made no sense for Sagewood to put $90,000 into the purchase of San Juan without retaining any legal interest in the property. They also point out that it is implausible for Sagewood to agree to take Marigold in trade for San Juan when Marigold was allegedly an uninhabitable property and was acquired for $15,000 less than San Juan.

The San Juan grant deed provided that, upon recording, it should be mailed to Presley Ann Prieto at the Marigold address. The San Juan deed of trust provided that upon recording, it was to be mailed to "P. Rodota" at a post office box address in Cathedral City. The fact that the San Juan deed was mailed to Marigold supports the Plaintiffs' claims that the Debtors were living at Marigold The fact that the San Juan deed of trust was mailed to Patricia supports the Plaintiffs' claim that the Debtors are the owners "in fact" of San Juan.

Assuming that Sagewood does exist, why would she agree to accept trade in a property worth $15,000 less than San Juan? Why would Walter Hammeken agree to work for free on Marigold even after his son married someone else? If Donald had actually acquired Marigold, why didn't he remember the gender of the broker in the transaction? Similarly, why did the San Juan broker only remember negotiating the San Juan acquisition with Walter and not with Donald or Sagewood? Furthermore, if the Debtors' version of the facts is correct and Marigold was being held in trust, by Donald for all of the Hammeken children, then Darren is guilty of a bankruptcy crime for failing to list his interest in Marigold on his bankruptcy schedules.[4] The Plaintiffs presented sufficient evidence of concealment by the Debtors of an ownership interest in San Juan

---

4. A debtor who makes a statement in a bankruptcy proceeding under penalty of perjury, which is false, related to a material fact, and made knowingly and fraudulently, violates the bankruptcy crime statutes. 18 U.S.C. § 152; *U.S. v. McCormick,* 72 F.3d 1404 (9th Cir. 1995).

and Marigold. The Debtors, on the other hand, did not provide a credible explanation of the circumstances surrounding the acquisition and transfer of Marigold or the acquisition of San Juan. While the Debtors argue Plaintiffs' evidence regarding Debtors' statements of ownership are mere hearsay, admissions against interest are admissible under Fed.R.Evid. 804(b)(3).

 The failure of the Debtors to call all of their children in support of the claims that Marigold was acquired for all of the children's benefit from the gifted funds is also significant. If the Debtors' version of the facts is true, it may be understandable that Darren would not wish to expose himself and his own bankruptcy discharge to scrutiny by testifying. However, no explanation was provided for Walter's absence, other than family estrangement. With the Debtors' discharge at risk, it is reasonable to assume that, notwithstanding any estrangement, he would have been called as a witness if his testimony would have been favorable to the Debtors. When a party fails to call a witness who may reasonably be assumed to be favorable to the party, an adverse inference may be drawn regarding any factual question on which the witness is likely to have knowledge. *Underwriters Lab., Inc. v. NLRB*, 147 F.3d 1048, 1054 (9th Cir.1998). Such inference is within the court's discretion. *Id.*

Mamika's testimony that he had never: (1) met Sagewood, (2) been to Palm Desert, California, (3) had anything to do with the acquisition of Marigold, or (4) given consent for the use of his social security number to put utilities and/or phone services in his name at either Marigold and San Juan is directly contrary to the Debtors' version of the facts. Mamika was a reluctant witness who only agreed to testify after being served with a subpoena. He did not appear to be hostile to the Debtors and had no financial interest in the litigation.

Taken as a whole, the Debtors' witnesses' testimony about the source of funding for the acquisition of Marigold and San Juan and the ownership of those properties is not credible. The Debtors did not call June Sagewood to testify or produce a single non-Hammeken family witness to testify that they had ever seen or met Sagewood. The lack of a disinterested third party witness' testimony to support the Debtors' version of the facts supports the Plaintiffs' theory that Sagewood is a fabricated name used by the Debtors to disguise their interest in Marigold and San Juan.[5]

 I find that the Debtors are the owners of both Marigold and San Juan and that the Debtors did not list those ownership interests on their schedules and statement of affairs. Pursuant to § 727(a)(2)(A), the Debtors are not entitled to a discharge because they concealed property within one year before the date of the filing of the Petition and continued to conceal their interests in both properties after their case was filed and even after being questioned about both properties by the Plaintiffs and Chapter 7 Trustee at their § 341 meeting. In such circumstances, the doctrine of continuing concealment is applicable. Under the con-

**5.** The Plaintiffs also offered into evidence another escrow file from Dixie Escrow for a house next to Marigold. That escrow was cancelled and the Plaintiffs contend that the money from that cancelled escrow was the source of the funds used to acquire San Juan. The source of the funds for the acquisition of San Juan is not, however, critical to the determination that the Debtors concealed their interest in San Juan. I have, therefore, not considered that evidence in reaching my decision that the Debtors should be denied a discharge under 11 U.S.C. § 727(a)(2)(A).

tinuing concealment doctrine, a transfer made and recorded more than one year prior to filing a bankruptcy petition may serve as evidence of concealment when the debtor retains a secret benefit of ownership in the transferred property. *In re Lawson*, 122 F.3d 1237, 1240–41 (9th Cir. 1997) (adopting the continuing concealment doctrine). Such "sham transactions" suffice to deny discharge. Additionally, the Debtors' transfer of both properties appear to have been made with the intent to interfere with the Trustee and creditors' attempts to locate assets of the Debtors. Therefore, denial of discharge is appropriate.

### B. *Mobile Home*

■■■ Patricia Hammeken testified that the Mobile Home was acquired in 1999 as a place for her mother-in-law, Dorothy Rosella Hammeken, to live. Patricia denied living there, but acknowledged that in 1999 she bought and lived, with Walter, in another mobile home located in Cathedral City. Patricia testified that in 2000 she sold the Mobile Home to Zantel Sanamento ("Sanamento"). The Debtors submitted a registration card from the State of California indicating that Sanamento was the registered owner of the Mobile Home in March of 2001. However, Patricia testified that she could not remember where she met Sanamento, how much the Mobile Home was sold for, or whether Sanamento paid the purchase price by cash or check.

The Plaintiffs provided evidence that, other than the Mobile Home registration and a phone number listing for the Mobile Home, Sanamento's name did not appear in any other data base.[6] The employees in the gated park where the Mobile Home is located have never heard of Sanamento.

The employees were only able to identify Dorothy Rosella and Patricia Hammeken, who used the name of Rodota in documents she filed with the park, as residents of the Mobile Home. According to those employees, the Mobile Home has been vacant since Dorothy Hammeken moved out.

The fact that the Debtors did not call Sanamento to testify at trial or produce a single non-Hammeken witness who has ever seen Sanamento is significant. Registering the Mobile Home and listing the phone number in Sanamento's name are not actions that require the production of independent identification. The Debtors could have arranged for both the registration and the phone number to be in Sanamento's name simply by submitting applications using that name. Patricia's inability to remember anything about the alleged sales transaction with Sanamento and the fact that the Mobile Home has remained vacant since Walter's mother moved out, are all important indications that there is no Sanamento. Accordingly, the Plaintiffs have met their burden of demonstrating, by a preponderance of the evidence, that the Debtors are not entitled to a discharge because of their continuing concealment of the Mobile Home.

### C. *Red Corvette*

■■■ The Debtors' testified that the red Corvette ("Red Corvette") was given to Donald as a Christmas present in 1993 in the form of six crates of parts which he then put together over the next three years. Donald testified that he owns two Corvettes, one red and one green and had both cars in his possession at the time of trial. He testified that he loaned his father the Red Corvette and encouraged his father to join the Palm Springs Corvette

---

6. Before the phone number of the Mobile Home was transferred to the name of Sanamento, the telephone number was in the name of Mamika. Mamika testified that he never authorized the use of his name to acquire telephone service at the Mobile Home.

Club to take his father's mind off of his drinking and gambling problems.

The Plaintiffs presented evidence that Walter told members of the Corvette Club that the Red Corvette belonged to him. Evidence was also presented that the Red Corvette only has a salvage title and carried dealer plates when Walter drove it. Walter apparently had the ability to put dealer plates on cars because a corporation, of which he was the sole principal, held a car dealer's license. The Plaintiffs argued that Walter must have been the real owner of the Red Corvette because (1) he drove it; (2) he told people he owned it; (3) he had the right to put dealer plates on cars; and (4) it had dealer plates when Walter drove it and there is no regular title in Donald's name.

That evidence, however, is insufficient to carry the Plaintiffs' burden of proof with respect to the ownership of the Red Corvette. The fact that the Red Corvette has a salvage title may demonstrate that Donald is violating Arizona law by not registering the car, but it does not demonstrate that the Red Corvette is actually owned by Walter. While Walter's statements to other members of the Corvette Club that he owned the car, is arguably, an admission against interest, it is also plausibly something he would say because he did not want to admit his son owned the car. The Plaintiffs' have not carried their burden of proof with respect to the Debtors' alleged ownership of the Red Corvette.

## VIII. ANALYSIS OF EVIDENCE REGARDING FALSE OATHS

 The Debtors have lied under penalty of perjury both in executing their schedules and in the testimony at their § 341 meeting regarding their former residences and other names they used in the six years before they filed their Chapter 7 Petition. Donald testified during the trial that while his father worked on Marigold in late 2000, his father was living in Cathedral City. The Debtors, however, in response to question 15 of their Statement of Financial Affairs (which required that the Debtors report all previous addresses in the two-year period before the Petition date), only listed the Winery address. At the § 341 meeting, Patricia Hammeken denied, under oath, ever living in Cathedral City. During the trial in this matter; however, Mrs. Hammeken did admit to living in Cathedral City in 1999 and the San Juan deed of trust was mailed to her at a Cathedral City address in 2000.

The Debtors also failed to list Patricia's maiden name as a name used in the six years prior to filing the Petition. At trial, Patricia admitted that the Reno bank account, which was the source of the cashier's checks used to acquire Marigold, was maintained under her maiden name Rodata. The Debtors also stated at their § 341 meeting and during a 2004 examination that they never owned any property in Palm Desert, California even though the Mobile Home records are in the name of Rodata and Patricia admitted that she and Walter lived in another mobile home in Cathedral City.

The omissions and false oaths do not appear to be the result of mere inadvertence. The multiple omissions of material assets has a cumulative effect of demonstrating that the Debtors have proceeded in their bankruptcy case with a cavalier disregard for the truth.

 The accurate and complete disclosure of former addresses and other names used by debtors is an important obligation for individuals who seek a bankruptcy discharge. The information enables the Chapter 7 Trustee and creditors to locate assets. The Debtors have an uncompromising duty to disclose whatever

ownership interest they have in property, even if they think the assets are worthless. *In re Coombs,* 193 B.R. 557, 564 (Bankr. C.D.Cal.1996). *All* assets must be disclosed in order that the trustee have accurate information without having to ferret out the true facts. *In re Aubrey,* 111 B.R. 268, 269 (9th Cir. BAP 1990). Likewise, the Debtors are required to provide full disclosure of all information that aids in understanding the Debtors' financial affairs and transactions. Such information is material. *See In re Coombs,* 193 B.R. at 566.

## IX. *CONCLUSION*

The Plaintiffs have demonstrated, by a preponderance of the evidence, that the Debtors have made false oaths in omitting material information from their schedules. The Plaintiffs have also met their burden of proof in demonstrating that the Debtors have an ownership interest in Marigold, San Juan and the Mobile Home. Therefore, the Debtors are not entitled to receive a discharge pursuant to 11 U.S.C. § 727(a)(2)(A) and § 727(a)(4)(A). Counsel for the United States is directed to lodge a judgment consistent with this Memorandum Decision no later than ten (10) days from today's date.