Jimmy GINN et al., Plaintiffs-Appellants,

v.

F. David MATHEWS, Secretary, United States Department of Health, Education and Welfare, et al., Defendants-Appellees.

No. 74–2607.

United States Court of Appeals, Ninth Circuit.

March 29, 1976.

Rehearing Denied May 10, 1976.

Dennis J. Woodruff (argued), San Francisco, Cal., for plaintiffs-appellants.

Benjamin D. James, Jr. (argued), of Williams & James, San Francisco, Cal., for defendants-appellees.

OPINION

Before CHAMBERS, KILKENNY and TRASK, Circuit Judges.

TRASK, Circuit Judge:

The three plaintiffs below, Jimmy Ginn, Helen Valdez, and Mitchell Zimmerman, appeal from the order of the district court granting the defendants' motions to dismiss and denying the plaintiffs' motions for summary judgment. The action was dismissed on May 30, 1974. The claim was that the defendant, the Economic Opportunity Council of San Francisco (EOC), a private nonprofit corporation, discharged the three without according them their due process rights under the Constitution of the United States, and in violation of their First and Fourteenth Amendment rights. It is the plaintiffs' position that EOC was in reality a de facto arm of the state and federal governments and its action constituted

"state action," and thus was subject to federal constitutional limitations.

The Economic Opportunity Council of San Francisco was a private corporation incorporated under the laws of the State of California. It operated the Project Headstart Program in San Francisco, which was a "community action program" within the meaning of the Economic Opportunity Act of 1964, 42 U.S.C. §§ 2701 *et seq.* Project Headstart was created by statute, 42 U.S.C. § 2809(a)(1), and focused upon children below the age of compulsory school attendance with a purpose to provide "such comprehensive health, nutritional, education, social, and other services" as the Director of the Office of Economic Opportunity (Director) finds would aid such children to reach their full potential. The Director was empowered to provide financial assistance "to public or private nonprofit agencies," to carry on such projects. 42 U.S.C. § 2809(a). The Economic Opportunity Council of San Francisco was such an agency. In this case, the Director did provide a measure of the financial assistance to EOC necessary for EOC to carry out its Headstart Program.

Taking the allegations of the plaintiffs' complaint as true, as we must on a motion to dismiss, *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263, 268 (1972); *Dodd v. Spokane County,* 393 F.2d 330, 334 (9th Cir. 1968), plaintiffs allege that Helen Valdez worked as a full-time teacher and permanent employee of EOC in the Headstart Program from 1967 to 1973. She was active in forming a union to represent employees in child-care programs, and she also actively and publicly supported a suit for back vacation pay filed against EOC in a superior court in California. She was terminated by EOC on October 19, 1973, without being afforded a hearing or an appeal. She is one of the plaintiffs in this action. Plaintiff Mitchell Zimmerman was employed by EOC in its state-funded Child Development Program from April 1972 to May 1973. Zimmerman was also active in forming the union and was a union officer; he also "publicly supported the

back pay suit." He was terminated on June 15, 1973, without a hearing. Plaintiff Jimmy Ginn was a community organizer and kitchen manager for EOC from 1967 to 1973. He also was active in the effort to unionize the Headstart staff. He was simply not rehired for the year 1974, but was subsequently offered a lower paying position which he accepted under protest.

All three in their prayer for relief seek damages from EOC as a result of not being able to work or as a result of being required to work at a lower paying job. They also seek injunctive relief restraining EOC from operating in violation of federal and state statutes, regulations, and directives, and further injunctive relief restraining the Department of Health, Education and Welfare (HEW) from funding EOC for further administration of the San Francisco Headstart Program.

Jurisdiction was invoked in the district court under 28 U.S.C. § 1331(a) (federal question jurisdiction); 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983 (deprivation of constitutional rights under color of state law); 28 U.S.C. § 1361 (mandamus); and 5 U.S.C. § 702 (Administrative Procedure Act).

The district court granted the motion to dismiss of the nonfederal defendants for the reason that the court lacked subject matter jurisdiction since EOC was a private corporation and no state action was involved; it granted the motion to dismiss of the federal defendants for the reason that the plaintiffs lacked standing to sue; and it denied the plaintiffs' motion for summary judgment against the federal defendants.

Upon appeal the issues have become more limited, and two questions are submitted by appellants for review: whether the district court erred in ruling that it lacked subject matter jurisdiction because defendant EOC was a private corporation and therefore not subject to the due process clauses of the Fifth and Fourteenth Amendments; and whether it erred in ruling that it lacked subject matter jurisdiction because there was no state action involved in the activities of EOC and therefore the First and

Fourteenth Amendments could not limit its activities.[1]

■ The principles that guide us in resolving the controversy have been announced before and are quickly recalled. Where the action taken is entirely by a private corporation with no overriding or pervasive state involvement, the provisions of the First, Fifth, and Fourteenth Amendments impose no limitations upon that action; when the state acts directly or even indirectly and its influence is significant, then constitutional restraints must be observed. It all began in the *Civil Rights Cases,* 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883). After stating the Fourteenth Amendment, Mr. Justice Bradley for the Court said:

"It is State action of a particular character that is prohibited. Individual invasion of individual rights is not the subject-matter of the amendment." *Id.* at 11, 3 S.Ct. at 21, 27 L.Ed. at 839.

Some 65 years later in *Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161, 1180 (1948), Mr. Chief Justice Vinson reiterated the same position:

"Since the decision of this Court in the *Civil Rights Cases,* 109 U.S. 3 [, 3 S.Ct. 18, 27 L.Ed. 835] (1883), the principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful."

More recently, the Court has reexamined the problem in *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). There, a restaurant which was a lessee in an automobile parking building owned and operated by the Wilmington Parking Authority, an agent of the State of Delaware, refused to serve a customer because he was black. In an action brought to obtain declaratory and injunctive relief, the Authority defended upon the ground that the restaurant was a private enterprise operating in a purely private capacity. The Court examined all of the circumstances under which the parking building was built and operated, pointing out the land was acquired by the Authority partly by the issue of its revenue bonds and in part by cash donated by the city of Wilmington. For the purpose of generating monies to fund the repayment of the revenue bonds because projected parking revenues were insufficient, long term leases were negotiated with tenants for other parts of the building including the restaurant. The Authority provided the type of finishing required by the lessee and agreed to furnish heat to the building and to make at its own expense all structural repairs. The Court held that the Authority's degree of participation and involvement in the restaurant indicated "that degree of state participation and involvement in discriminatory action which it was the design of the Fourteenth Amendment to condemn." *Id.* at 724, 81 S.Ct. at 861, 6 L.Ed.2d at 52.

"The State has so far insinuated itself into a position of interdependence with [the restaurant] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." *Id.* at 725, 81 S.Ct. at 862, 6 L.Ed.2d at 52.

■ In the case before us, the government participation in Project Headstart began in 1964 when Congress enacted massive legislation to launch a great antipoverty program. The Economic Opportunity Act, 42 U.S.C. §§ 2701 *et seq.,* begins:

"The United States can achieve its full economic and social potential as a nation only if every individual has the opportunity to contribute to the full extent of his capabilities and to participate in the workings of our society. It is, therefore,

1. HEW has not funded EOC to operate the Headstart Program for 1974–75, and the question whether the plaintiffs lacked standing to sue HEW is not pursued. Plaintiffs have dismissed their appeals as to the federal defendants and the questionable subject matter jurisdictional claims as to the federal defendants are not ruled upon here.

the policy of the United States to eliminate the paradox of poverty in the midst of plenty in this Nation by opening to everyone the opportunity for education and training, the opportunity to work, and the opportunity to live in decency and dignity. It is the purpose of this chapter to strengthen, supplement, and coordinate efforts in furtherance of that policy."

The Director of the Office of Economic Opportunity is authorized to provide financial assistance to public or private nonprofit agencies to carry on the projects provided for in the Act, including:

"A program to be known as 'Project Headstart' focused upon children who have not reached the age of compulsory school attendance which (A) will provide such comprehensive health, nutritional, education, social, and other services as the Director finds will aid the children to attain their full potential . . . ." 42 U.S.C. § 2809(a)(1).

The sum of $476 million was authorized to be appropriated for the purpose of carrying out this and other community action programs for the fiscal year ending June 30, 1968.[2]

The defendant, EOC, received $834,000 from HEW for the operation of its Headstart Program. It also receives some support from the community and the municipal government. As might be expected, the generous purse was not made available without the ever-present strings attached.[3] Numerous restrictions and conditions were imposed on EOC by the federal government, and it even prepared a manual for operations called the "Headstart Policy Manual," one provision of which specified that a Headstart Policy Council, consisting in part of parents of Headstart children, be created by each grantee agency and that such council be permitted to approve or disapprove the hiring and firing of Headstart staff. C.T. at 208–09.

The district court relied solely upon *Hines v. Cenla Community Action Committee, Inc.*, 474 F.2d 1052 (5th Cir. 1972), for its decision that here we have private action only, with no federal or state intrusion which might require consideration of the limitations of the Fifth or Fourteenth Amendments.[4] *Hines* might be distinguished by the fact that the employee termination there was of the executive director of the community action program and that he was terminated by the board of directors with no higher authority to which to appeal. But as Judge Wisdom's dissent makes clear, 474 F.2d at 1059–60, the basic issue was the state action issue, and the majority found that neither the state nor

---

**2.** Pursuant to presidential order, supervision of Project Headstart was delegated from the Office of Economic Opportunity to HEW effective July 1, 1969. 34 Fed.Reg. § 11398 (1969).

**3.** Historical facts and figures are largely taken from appellants' brief; they were not challenged by the appellees and appear to be borne out by the statute and regulations. *See* 42 U.S.C. §§ 2795–2796.

Section 2796 provides in part:

"And each community action agency shall adopt for itself and other agencies using funds or exercising authority for which it is responsible, rules designed to establish specific standards governing salaries, salary increases, travel and per diem allowances, and other employee benefits; to assure that only persons capable of discharging their duties with competence and integrity are employed and that employees are promoted or advanced under impartial procedures calculated to improve agency performance and effectiveness; to guard against personal or financial conflicts of interests; and to define employee duties of advocacy on behalf of the poor in an appropriate manner which will in any case preclude employees from participating, in connection with the performance of their duties, in any form of picketing, protest, or other direct action which is in violation of law.

"(b) The Director shall prescribe rules or regulations to supplement subsection (a) of this section, which shall be binding on all agencies carrying on community action program activities with financial assistance under this subchapter."

**4.** EOC was the agent for expenditure of state as well as federal funds. Thus, both the Fifth and the Fourteenth Amendment issues are involved. We consider the question of "state" action in its broad sense as involving both state and federal participation. *Simkins v. Moses H. Cone Memorial Hosp.*, 323 F.2d 959, 967 (4th Cir. 1963).

the federal participation was such as to require consideration of First, Fifth, or Fourteenth Amendment limitations. We suspect the court did not look very carefully.[5] "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Burton v. Wilmington Parking Authority, supra* at 722, 81 S.Ct. at 860, 6 L.Ed.2d at 50.

In any event, on the record here we find abundant evidence of significant state action which brings this case within *Burton* and without the parameters of *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). It is akin to *McQueen v. Druker,* 438 F.2d 781 (1st Cir. 1971), where the court said:

> "Mere receipt of financial subsidy and subjection to some regulation are the conditions of much of our societal life. Neither factor—or both together—is dispositive of 'state action'. But, while we disavow any effort to be definitive, we conclude that at least when a specific governmental function is carried out by heavily subsidized private firms or individuals whose freedom of decision-making has, by contract and the reserved governmental power of continuing oversight, been circumscribed substantially more than that generally accorded an independent contractor, the coloration of state action fairly attaches." *Id.* at 784–85.

Therefore, it is our view that the complaint states a claim upon which relief may be granted on either or any of the First, Fifth, or Fourteenth Amendment claims. We express no view as to the merits of those claims.

The judgment is reversed and the cause is remanded for trial.

---

**5.** For additional development of distinctions of *Hines* from the thrust of *Burton v. Wilmington Parking Authority,* see *Robinson v. Wichita Falls & North Texas Community Action Corp.,* 507 F.2d 245, 250–51 (5th Cir. 1975).