In re Norman BARMAN, Debtor.

Charles J. Taunt, Trustee, Plaintiff,

v.

Norman Barman, Kimberly Barman, Bruce Carson, and Doe Defendants 1–25, Defendants.

Bankruptcy No. 99–45133–R.
Adversary No. 99–4992.

United States Bankruptcy Court,
E.D. Michigan,
Southern Division.

Aug. 21, 2000.

Charles Bullock, Southfield, MI, for Plaintiff.

Frank Fortescue, Detroit, MI, Arthur Brauer, Birmingham, MI, for Defendants.

*Amended*

*Opinion and Order Denying Motion to Suppress*

STEVEN W. RHODES, Bankruptcy Judge.

Defendant Norman Barman's motion to suppress evidence raises interesting and novel issues about the processes that are constitutionally required in connection with a trustee's inspection of a debtor's residence. Because of the close nexus between government authority and a chapter 7 trustee, the Court concludes that the fourth amendment does apply to such an inspection. However, because in this case the trustee's conduct in obtaining a court order authorizing the inspection was "reasonable" under prevailing fourth amendment standards, the motion to suppress is denied.

## I. Introduction

On March 30, 1999, Norman Barman filed a petition for chapter 7 relief. The only asset that the debtor disclosed was wearing apparel worth $500. On December 20, 1999, the trustee filed this adversary proceeding complaint. In Count I, the trustee alleges that the debtor fraudulently transferred funds to his wife, Kimberly Barman, for the purchases of homes, first in Warren, Michigan and then later in Milford, Michigan. Count II alleges that the bankruptcy estate is the actual owner of a business named "Miss Q Billiards." Count III alleges that the ownership of Miss Q Billiards was fraudulently transferred from Norman Barman to the other defendants. Count IV alleges that Norman Barman fraudulently concealed assets of the estate and requests revocation of the discharge.

Contemporaneous with the filing of this adversary complaint, the trustee filed an ex parte motion for an order authorizing the trustee to enter Norman and Kimberly Barman's residence in Milford and to inspect, inventory and appraise personal property. The motion set forth in detail the legal and factual grounds for the relief requested and was granted in an order entered by Bankruptcy Judge Walter Shapero.[1] The trustee then carried out the inspection of the Milford residence. Later, the debtor filed this motion to suppress and the trustee responded. The issues raised in the motion to suppress require a detailed review of the allegations in the trustee's verified motion for the inspection order.

## A. The Inspection Motion

Initially, the motion notes that under 11 U.S.C. § 542, a debtor has a duty to account for and deliver property of the bankruptcy estate to the trustee and that under 11 U.S.C. § 704, the trustee has the duty to investigate a debtor's financial affairs and to account for, collect and reduce to money, property of the bankruptcy estate. (Trustee's ex parte motion, ¶¶ 5 and 6.) The motion then alleges that the trustee has been hindered in investigating the debtor's several vending and video machine businesses because the debtor had thrown away the financial records relating to these businesses. The trustee cites pages 37–39 of the transcript of the debtor's testimony at the meeting of creditors, which is attached to the motion as exhibit B, as support for his allegation. (Motion, ¶ 7.) When questioned at both the meeting of creditors and at a deposition, the debtor was reluctant to discuss the placement and removal of these machines, especially the video poker machines, which are illegal in Michigan, as reflected in the transcripts of his depositions attached to the motion as exhibits C, D and E. (Motion, ¶ 8.) The trustee alleges that he is investigating the debtor's interests in four parcels of real estate, which may have been purchased in the names of others to avoid

---

**1.** The trustee's motion also requested a temporary restraining order against Norman and Kimberly Barman, which Judge Shapero also granted.

creditors. Again, the trustee cites the transcript of the debtor's deposition attached as exhibit F as support for his allegation. (Motion, ¶ 9.)

Using his parents' names, the debtor purchased a home in Troy, Michigan, which he sold in February, 1997. That sale allowed him to receive, through his parents, cash in the amount of $157,939.79, citing exhibit F. (Motion, ¶ 10.) The debtor also owned $40,000 worth of furniture at that home, according to his deposition testimony, exhibit F. (*Id.*) After that sale, the debtor arranged, again through his parents, to purchase a home in Georgetown, South Carolina for $680,000, with $160,000 down, according to his testimony at his meeting of creditors, attached as exhibit G. (Motion, ¶ 11.) Some of the furniture from the Troy, Michigan home was moved to the Georgetown, South Carolina home, according to exhibit F. (Motion, ¶ 12.)

After the debtor's business, "BHB Enterprises," filed bankruptcy in South Carolina, the trustee there obtained an order prohibiting the debtor, Norman Barman, and others from transferring or encumbering the Georgetown home. The debtor was found in contempt for willfully violating that order by arranging to have the home refinanced to acquire the equity in the home. The contempt order of the South Carolina bankruptcy court reciting these facts is attached to the motion as exhibit H. (Motion, ¶ 13.) The $130,000 proceeds of the refinancing were wire transferred to the account of the debtor's parents in Michigan, and the debtor withdrew those proceeds in cash in increments of $20,000–$30,000, according to his deposition testimony, exhibit F. (Motion, ¶ 14.) The debtor further testified that he spent and gambled this entire sum, as transcribed in exhibit F.[2] (Motion, ¶ 15.)

The trustee further alleges that Kimberly Barman, the debtor's wife, testified in depositions that she earned $29,000 in 1998 and expected to earn $70,000 in 1999, and that she had no source of income other than from Miss Q Billiards for the past five years. The depositions are attached as exhibits I and J to the motion. (Motion, ¶ 17.) The trustee then states that on June 11, 1998, Kimberly Barman purchased a home in Warren, Michigan for $130,000, with $40,000 down, which was at the same time that the debtor received $130,000 from the refinancing of the South Carolina home. The transfer documents for the Warren home are attached to the motion as exhibit K. The debtor testified in deposition, exhibit L, that he owned the furniture in storage at the Warren home. (Motion, ¶ 19.)

After the debtor's parents filed bankruptcy, they testified at their own meeting of creditors that on July 23, 1998, they had purchased $5,000 worth of furniture for the debtor as a house warming present for the new Warren home. (Exhibits M and N) (Motion, ¶ 20.)

The only asset disclosed in the debtor's bankruptcy schedules was apparel worth $500. Neither the furniture from South Carolina nor the furniture from the debtor's parents was disclosed. In addition, both the debtor and Kimberly Barman testified that the debtor does not own or possess any video machines. (Exhibits J and O) (Motion, ¶ 21.)

The trustee alleges that on September 16, 1999, the Warren home was sold and Kimberly Barman received the equity of $59,415.49. This allegation is supported by the documents attached in exhibit P. (Motion, ¶ 22.) On September 30, 1999, Kimberly Barman purchased a home in

---

2. On February 14, 2000, the debtor's discharge was denied due to his failure to keep and maintain books and records, and due to his inability to explain satisfactorily the loss of the $130,000 refinancing proceeds. *Solomon v. Barman (In re Barman)*, 244 B.R. 896 (Bankr.E.D.Mich.2000). Previously, on June

18, 1999, in the bankruptcy case filed by the debtor's parents, Harold and Evelyn Barman, their discharge was denied due to their willful violation of the South Carolina bankruptcy court order in the BHB case. *Solomon v. Barman (In re Barman)*, 237 B.R. 342 (Bankr.E.D.Mich.1999).

Milford, Michigan for $415,000, with $83,000 down. The trustee believes that this home is property of the bankruptcy estate. The debtor lives with Kimberly Barman in this home according to her testimony. (Motion, ¶ 23.) Kimberly Barman testified that the down payment for this home came from the equity from the Warren home and from savings. (Motion, ¶ 24.) These allegations are supported by Kimberly Barman's testimony attached as exhibit Q.

Exhibit R attached to the motion is a sworn statement from a process server who visited the Milford home on December 6, 1999 and observed between fifteen and twenty video machines in the garage. (Motion, ¶¶ 25 and 26.)

The trustee further alleges that Kimberly Barman was not forthright in his investigation in the case, as demonstrated by three instances of documented false testimony by her. First, her explicit denial of any business interests other than Miss Q Billiards was later retracted. (Exhibits S and T.) Second, she indicated that she did not make the down payment to purchase a business called "Silhouettes," but exhibit U is a copy of a check signed by her for that purpose. Finally, she indicated that the debtor had nothing to do with the purchase of Silhouettes, but exhibit V is a copy of a UCC financing statement for the business signed by the debtor. Thus, the trustee alleges a concern that Kimberly Barman has an apparent proclivity to protect the debtor's interests. (Motion, ¶ 27.)

Kimberly Barman also purchased a 1999 van for $30,000 and a 1999 Cadillac for which she paid $16,000 down, consisting of a cashier's check for $7,000 and cash of $9,000, according to the documents of this transaction, exhibit X. (Motion, ¶ 28.)

The trustee then concludes that "it is highly unlikely that the Debtor's only asset is five hundred ($500.00) dollars in clothing[.]" (Motion, ¶ 29.) The trustee further alleges the "probable existence" of property of the debtor that was not disclosed, including furniture and video machines at the Milford residence. (Motion, ¶ 31.)

Finally, the trustee alleges:

The Trustee's counsel was informed, on December 17, 1999 that the Debtor had a trailer at his residence (401 Trotter Trail, Milford, Michigan) that contained personal property of the Debtor and/or the Debtor's wife. This information was provided to the Trustee by a party that is involved with post-petition business litigation involving the Debtor and persons/entities related to the Debtor (including Kimberly Barman). In addition to the existence of the trailer, the Trustee was informed that according to what was witnessed at the residence, including the condition of the house and the existence of a mobile home near the premises, it appeared that the Debtor and his family may be moving from that residence. The Trustee has expedited the filing of both an adversary proceeding against the Debtor and related parties and this motion to avoid the likely irreparable harm to the bankruptcy estate in light of the Debtor's history of flight and defiance of previous bankruptcy court orders.

(Motion, ¶ 31.)

Paragraph 32 of the motion then requests a temporary restraining order and paragraph 33 requests the inspection order.

The basis for the ex parte request is set forth in paragraph 35:

The Trustee believes that if the Debtor is given advanced warning concerning this entry and appraisal of the personal property, then a less than full and candid inventory of personal property will occur particularly in light of the Debtor's previous violation of a bankruptcy court order (temporarily enjoining the Debtor from taking any actions related to his property) and his experience in moving assets in a variety of situations.

(Motion, ¶ 35.)

The basis for requesting assistance by the U.S. Marshal is set forth in paragraph 36:

Given the past history of the Debtor's lack of cooperation with respect to bankruptcy proceedings, the Trustee requests that a U.S. Marshal accompany the Trustee, the Trustee's counsel, and the Appraiser employed by the estate during the entry and inventory of the property. Further, the Trustee requests that the Debtor and/or Kimberly Barman instruct the Trustee of any dangerous conditions on the property including the existence of firearms or other similar devices, and also instruct the Trustee about the location of any and all property at the residence that is hidden for safekeeping or for any other purpose. Further, the Trustee requests that the Debtor, Kimberly Barman, or any designated representative assist the Trustee in conducting the inspection and inventory of the personal property.

(Motion, ¶ 36.)

The concluding paragraph of the motion states:

The Trustee has verified the information in this motion, pursuant to the information available at this time, as true and accurate. In addition, the Trustee asserts that the relief requested in this motion is necessary to avoid irreparable harm to the bankruptcy estate. See the Trustee's Affidavit attached to this motion and labeled Exhibit "Z".

(Motion, ¶ 38.)

### B. The Inspection Order

On December 21, 1999, Judge Shapero granted the trustee's motion and entered the inspection order, based on this finding: the Trustee ... having shown in the motion and in the accompanying exhibits (including the Trustee's affidavit) that immediate and irreparable injury, loss or damage will result should the requested relief not be granted and for the

reason that prior notice to the opposing party would result in less than full and candid disclosure of assets and potential harm to the bankruptcy estate ....

More specifically, Judge Shapero found:

A) The facts asserted by the Trustee that were elicited from sworn testimony of the Debtor and parties associated with the Debtor, specifically allegations related to the likelihood of the Debtor having significantly more assets than the listed five hundred ($500.00) dollars in assets listed in the Debtor's schedules, the Debtor's pattern of having property placed in the names of other people to be held, managed, or otherwise administered, and the difficulty in discovering or tracing assets in the video/vending machine business are factors that show the high potential of irreparable harm and the damage to the bankruptcy estate that may not be detected absent granting the relief requested; and

B) The factors listed above, combined with the Debtor's previous disregard of orders of the bankruptcy court related to the disposition of property controlled by the Debtor (specifically the order of September 25, 1998 in the BHB Enterprises Bankruptcy (Case No. 97–01975–W, Adv. Pro. No. 97–80227–W) holding the Debtor in contempt for violating a temporary injunction) are factual allegations that support the granting of the relief requested which includes the issuance of a temporary injunction.

(Order, December 21, 1999, ¶¶ A and B.)

On December 22, 1999, the trustee conducted the inspection. Kimberly Barman was present but Norman Barman was not.

### II. The Parties' Contentions

Norman Barman seeks to suppress the evidence obtained by the trustee in the course of his inspection of the Milford home on the grounds that the inspection violated his fourth amendment rights against unreasonable search and seizure.[3]

---

**3.** Although also a defendant in this action, Kimberly Barman has not joined in this motion.

He argues that the order permitting the inspection was nothing more than a general warrant or writ of assistance, which violated the fourth amendment. He further contends that the trustee failed to obtain a search warrant as required and failed to particularly describe the objects to be searched. He also argues that proper notice was not provided to him or his attorney.

The trustee argues that he sought the ex parte order allowing the inspection because he believed that the debtor would attempt to conceal assets at the home if given advance notice. Further, the trustee contends that he did give the debtor's attorney notice by fax on the morning of the inspection. Moreover, the trustee contends that Kimberly Barman consented to the search after consulting with her attorney. The trustee states that she refused entry until she could speak to her attorney, Frank Fortescue. The trustee contends that after both Kimberly Barman and the trustee spoke by phone to Frank Fortescue, Kimberly Barman consented to the inspection.

## III. The Trustee's Consent Argument

■■■ First, the Court must reject the trustee's defense that Mrs. Barman, the owner of the Milford home, consented to the search and that therefore the debtor's fourth amendment rights were not violated. *See Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). Consent to a search must be freely and voluntarily given. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Although the Court did not hold an evidentiary hearing on this point, it appears that when the trustee, in the company of deputy U.S. Marshals, went to the Milford home to execute the inspection order, Mrs. Barman consulted with her attorney, who then consulted with the trustee. Mrs. Barman then allowed the inspection without further objection. These circumstances suggest that Mrs. Barman simply acquiesced "to a

claim of lawful authority," which the Supreme Court has held is not free and voluntary consent. *Bumper v. North Carolina,* 391 U.S. 543, 549, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968).

Accordingly, it becomes necessary to determine whether the trustee's inspection of the Milford home violated the debtor's fourth amendment rights, as the debtor claims.

## IV. The Debtor's Fourth Amendment Rights

The fourth amendment to the U.S. Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. Amend. IV.

The Court has been unable to locate any case law addressing the application of the fourth amendment in the context of a bankruptcy trustee's inspection of a debtor's property. However, in determining whether the debtor's fourth amendment rights were violated in this case, familiar and fundamental fourth amendment principles provide ample guidance.

### A. A Chapter 7 Trustee Is Bound by the Fourth Amendment

■■ The first such principle is that the fourth amendment broadly protects citizens from abuses by the government; *United States v. Calandra,* 414 U.S. 338, 354, 94 S.Ct. 613, 622, 38 L.Ed.2d 561 (1974), although not from actions of private parties. *Burdeau v. McDowell,* 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921). In an analogous context under state law, the Supreme Court has held that a person acts under color of law if that person's conduct is fairly attributable to

the government. *See Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982).[4]

■ Thus, the issue is whether a bankruptcy trustee's inspection of a debtor's residence to look for estate assets is fairly attributable to the government or to private interests. There is authority that the trustee is a private party and is not authorized to obtain a search warrant to search for evidence of a crime under Rule 41 of the Federal Rules of Criminal Procedure. *In re Application of Trustee in Bankr. for a Search Warrant*, 173 B.R. 341 (N.D.Ohio 1994). Nevertheless, the trustee does act under the authority of law when inspecting a debtor's residence to search for property of the estate. *See* 11 U.S.C. § 704 and FED.R.BANKR.P.2015(a)(1) (establishing the trustee's duties to collect and be accountable for property of the estate); 28 U.S.C. § 1334(e) (establishing the district court's exclusive jurisdiction over a debtor's property when a bankruptcy petition is filed, and over property of the estate).

■ Also, the statutory provisions relating to the trustee's status as a trustee suggest a relationship sufficiently close to the government that the fourth amendment applies, even though the trustee is not technically an employee of the government. These provisions establish that the chapter 7 trustee is appointed and supervised by an official of the Department of Justice, the United States Trustee.[5] *See* 11 U.S.C. § 701(a)(1); 28 U.S.C. §§ 581, 586(a)(1), 586(a)(3) and 586(c); 28 C.F.R. § 58.4 (1999). The United States Trustee has the authority to remove a trustee from the panel of trustees. 28 C.F.R. § 58.6; *Joelson v. United States*, 86 F.3d 1413 (6th Cir.1996). The court may remove a trustee in a particular case "for cause." 11 U.S.C. § 324(a). The trustee's fees in a case are subject to approval by the court. 11 U.S.C. § 326(a). A trustee may hire an attorney or other professionals only with the approval of the court. 11 U.S.C. § 327(a). These provisions establish that every aspect of a trustee's position and function is subject to either statutory obligation or to federal executive or judicial branch control.

■ Finally, in addition to these statutory provisions, the case law applying the doctrine of "derived judicial immunity" in favor of trustees has long recognized the connection that trustees have to the government and specifically to the bankruptcy court. *Kashani v. Fulton (In re Kashani)*, 190 B.R. 875, 883 (9th Cir. BAP 1995).

> It has long been established that a bankruptcy trustee is an officer of the appointing court. As an officer of the court, the trustee is entitled to a form of derivative judicial immunity from liability for actions carried out within the scope of the trustee's official duties.

*Id. See also LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1 (1st Cir.1999); *Gregory v. United States*, 942 F.2d 1498 (10th Cir.1991); *Bennett v. Williams*, 892 F.2d 822, 823 (9th Cir.1989). *See also Mosser v. Darrow*, 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951).

■ Accordingly, the Court concludes that these circumstances surrounding the status and function of a trustee in a chapter 7 case all suggest a sufficient nexus to

---

**4.** *Lugar* arose in the context of state law and state action. However, it has been held that the term "state" as used in that specific context encompasses federal action taken under color of federal law. *See Ginn v. Mathews*, 533 F.2d 477, 480 n. 4 (9th Cir.1976); *Reuber v. United States*, 750 F.2d 1039, 1057 (D.C.Cir.1984).

**5.** Under 11 U.S.C. § 701(a), the United States Trustee actually appoints an "interim" trustee

when the case is filed. Then, if the creditors elect a trustee under 11 U.S.C. § 702, the service of the interim trustee is terminated. However, such elections are extremely rare, and there was no election in this case. When there is no election, 11 U.S.C. § 702(d) provides that the interim trustee shall serve as the trustee. Thus, for all practical purposes, the trustee is routinely appointed by the Department of Justice.

the government and its power that it is necessary and appropriate to apply to the trustee the fourth amendment limits on government power.[6]

### B. The Fourth Amendment's Standard of "Reasonableness"

The second fundamental principle to be considered is that the fourth amendment only protects against "unreasonable" search and seizure. The test for reasonableness cannot be fixed by per se rules, but depends on the facts of each case. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). *See also Tarter v. Raybuck*, 742 F.2d 977, 981 (6th Cir.1984) ("[T]he basic concern of the fourth amendment is reasonableness, and reasonableness depends upon the particular circumstances.") (citation omitted).

In the civil context, the standards of reasonableness are less stringent than in the criminal context. *See United States v. Gordon*, 493 F.Supp. 808, 813 (N.D.N.Y.1980), *aff'd*, 655 F.2d 478 (2d Cir. 1981). *See also Nixon v. Administrator of Gen. Serv.*, 408 F.Supp. 321, 366 (D.D.C. 1976) ("[A] less strict and particularized government showing is necessary to comply with the fourth amendment's reasonableness requirement when the search is entirely 'civil' in nature.") (citations omitted).

Although the requirements of 'probable cause and specificity do not apply strictly where an administrative or civil order of seizure is issued by a court,' in issuing civil seizure orders, courts are guided by the principles of probable cause and particularity that underlie the notion of reasonableness in the context of searches and seizures. *Paramount Pictures Corp. v. Doe*, 821 F.Supp. 82, 90 (E.D.N.Y.1993) (citations omitted). *See also Tarter*, 742 F.2d at 981 ("Although incursions on the fourth amendment should be guarded jealously, not infrequently the ordinary requirements of the fourth amendment are modified to deal with special circumstances."); *Marshall v. Barlow's Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (administrative search); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("stop and frisk" search upon reasonable suspicion).

Accordingly, the Court concludes that in determining whether the trustee violated the debtor's fourth amendment rights, the issue is whether the trustee's inspection of the debtor's residence was "reasonable."

### C. A Debtor's "Reasonable Expectation of Privacy"

The third general principle to be considered is that the fourth amendment is intended to protect an individual's reasonable expectation of privacy, as much as his property. *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring); *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). *See also Soldal v. Cook County*, 506 U.S. 56, 62, 113 S.Ct. 538, 544, 121 L.Ed.2d 450 (1992); *DePugh v. Penning*, 888 F.Supp. 959, 971 (N.D.Iowa 1995). Therefore, in determining whether the trustee's inspection of the debtor's residence was reasonable, it is

---

6. There is an additional consideration suggesting that the inspection order in this case was executed under color of federal law. As noted, at the trustee's request, the inspection order included a provision for the assistance of the U.S. Marshal in conducting the inspection. Such "participation would establish both state action and action under color of state law." *Howerton v. Gabica*, 708 F.2d 380, 382 n. 5 (9th Cir.1983) (Action taken by landlord was "under color of state law" where actions of police officer in accompanying landlord when serving eviction notice and in privately approaching tenants and recommending that they leave created appearance that police sanctioned eviction.).

However, this does not suggest that in the absence of assistance from the U.S. Marshal, the fourth amendment would not apply to an inspection order. The Court concludes that the other circumstances surrounding such an order are sufficient to justify the conclusion that in either event the fourth amendment applies.

critical to determine first the extent to which a debtor's expectation of privacy in his residence is one that "society is prepared to recognize as reasonable." *Katz,* 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring); *Fox v. VanOosterum,* 176 F.3d 342, 350 (6th Cir.1999). *See also California v. Ciraolo,* 476 U.S. 207, 106 S.Ct. 1809, 1810, 90 L.Ed.2d 210 (1986).

■ Fundamentally, it is clear that compared to other people who have not filed for bankruptcy relief, debtors who have filed for bankruptcy relief must have a significantly reduced expectation of privacy in their "houses, papers, and effects" that society is prepared to recognize as reasonable. The reduced expectation of privacy is a natural consequence of the substantial and detailed disclosures that are inherent in the bankruptcy process. Every debtor is required by 11 U.S.C. § 521(1) to file "a list of creditors, … a schedule of assets and liabilities, a schedule of current income and expenditures, and a statement of financial affairs[.]" This requirement is also set forth in FED. R.BANKR.P. 1007(b)(1), which also requires that these disclosures be prepared as prescribed by the appropriate Official Forms. *See also* FED.R.BANKR.P. 9009. Official Form 6, schedule B, requires every debtor to disclose the description and location, the ownership interests of spouses and the market value of thirty three listed types of personal property.[7] These papers, with their highly detailed and personal disclosures, are routinely placed into court files that are available for inspection and copying by the public. It is fair to say that upon filing bankruptcy, a debtor's descriptions of his property are a matter of public record, conditioned only upon the extent of the debtor's honesty and detail. For fourth amendment purposes, these disclosures substantially reduce a debtor's

reasonable expectation of privacy regarding his property interests.

This does not mean however that a debtor has no reasonable expectation of privacy in his residence or personal property upon filing bankruptcy. Three considerations suggest that a debtor continues to have some reasonable expectation of privacy following the filing of a bankruptcy petition. The first is the abundantly plain observation that unlike the written and filed disclosures that are available to the public by law, an inspection of a debtor's home is not open to the public.

■ Second, nothing in the Bankruptcy Code states or implies an obligation upon a debtor to permit an inspection by a trustee without a court order. A debtor's statutory obligations include these obligations:

(1) to file detailed written disclosures of property under 11 U.S.C. § 521(1);

(2) to appear for examination at the meeting of creditors under 11 U.S.C. § 343;

(3) to surrender property of the estate to the trustee under 11 U.S.C. § 521(4); and,

(4) to "cooperate with the trustee" for certain specified purposes under 11 U.S.C. § 521(3) and FED.R.BANKR.P. 4002(4).

Neither the obligation to file written disclosures nor the obligation to appear at the creditors' meeting relates at all to an inspection of a debtor's residence by the trustee. The general obligation to cooperate has never been construed to require a debtor to allow an inspection without a court order. The obligation to surrender property to the trustee is rarely invoked by a trustee because in nearly all chapter 7 cases, the debtor's property is of inconsequential value to the estate due to the debtor's exemptions.[8] Accordingly, none

---

**7.** Interestingly, the advisory committee note to Official Bankruptcy Form 6 states, "The schedules require a complete listing of assets and liabilities but leave many of the details to

investigation by the trustee." Official Bankruptcy Form 6 committee note.

**8.** *Compare* 11 U.S.C. § 542(a), which requires any party in possession of estate property to

of these provisions have the effect of requiring a debtor to permit an inspection of his residence without a court order or substantially undermines a debtor's reasonable expectation of privacy in his residence.

 Third, as just noted, even though under 11 U.S.C. § 541, the debtor's personal property is brought into the bankruptcy estate upon filing, in almost all cases this property reverts to the debtor through exemption very shortly after the case is filed.[9] Thus, in these cases, the estate's interest in the property is quite limited, both in time and in function, and the debtor retains a substantial practical and beneficial interest in that property even while it is temporarily property of the estate.

Accordingly, the Court concludes that although a debtor has a diminished expectation of privacy due to his bankruptcy filing, a debtor still maintains some reasonable expectation of privacy in his residence.[10]

### D. The Specific Procedures Required by the Fourth Amendment

#### 1. Guidance from Case Law in Other Contexts

Having determined that a bankruptcy trustee is bound by the fourth amendment, that a debtor is entitled to protection against "unreasonable" searches and that a debtor in bankruptcy has a reduced expectation of privacy in his residence that society would be prepared to recognize as reasonable, the next matter is to define the specific protections to which a debtor in bankruptcy is entitled under the fourth amendment. The process of defining these protections is guided by the principles and conclusions developed above. It is also guided by those decisions of the Supreme Court which have addressed fourth amendment protections in the context of administrative inspections and searches.

For example, in *Camara v. Municipal Court of the City and County of San Francisco*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), the Court held that absent the consent of the occupant, a building inspector must obtain a search warrant to inspect a personal residence for building code violations. However, the Court rejected the argument that the warrant could only be issued upon a showing of probable cause to believe that the building to be inspected contained building code violations. Rather, the Court concluded that other reasonable legislative or admin-

---

deliver it to the trustee unless it is "of inconsequential value or benefit to the estate."

National statistics are not readily available from either the United States Trustee Program or the Administrative Office of United States Courts on the percentage of chapter 7 cases that are closed with assets distributed to creditors.

However, the Clerk of Court for the Eastern District of Michigan reports that in Detroit in the month of December, 1999 (a month chosen at random), there were 1021 chapter 7 cases closed, of which 6 (0.6%) were asset cases. The other 99.4% were closed with all assets exempted by the debtor or abandoned by the trustee.

9. Objections to exemptions must be filed within 30 days after the conclusion of the meeting of creditors or are deemed waived. FED. R.BANKR.P. 4003(b); *Taylor v. Freeland & Kronz*, 503 U.S. 638, 643, 112 S.Ct. 1644, 1648, 118 L.Ed.2d 280 (1992). In a chapter 7

case, the meeting is scheduled 20–40 days after filing. FED.R.BANKR.P.2003(a). Thus, except in the rare case in which an objection to exemptions is filed, or in the rare case in which there are non-exempt assets, all estate property revests in the debtor within 50–70 days after filing.

10. In a somewhat different context, the court in *Wade v. Smith*, 1991 WL 504873, *6 (S.D.Ind.1991), recognized that "a bankrupt cannot reasonably expect to be free from intrusions by the trustee, who is entitled to possession of the bankrupt's property." *See also United States v. Masterson*, 383 F.2d 610, 613 (2d Cir.1967). However, the court went on to state that "a constitutional violation could lie if the defendants' conduct was sufficiently outrageous, such as if the defendants injured or abused the plaintiffs.... A bankrupt does not relinquish all fourth amendment protections upon the filing of a bankruptcy petition." *Wade* at *6.

istrative standards, implicating such matters as the passage of time, the nature of the building and the condition of the area, would be sufficient under the fourth amendment. In its analysis, the Court balanced "the need to search against the invasion which the search entails." *Id.*, 387 U.S. at 537, 87 S.Ct. 1727. Specifically, the Court considered the "long history of judicial and public acceptance" of inspection programs, the public interest in preventing and abating dangerous building conditions, the need for an interior inspection to achieve acceptable results and the limited invasion of privacy resulting from the inspection because it is neither personal nor aimed at discovering evidence of crime. *Id.* The Court also considered whether "the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search." *Id.* at 532, 87 S.Ct. 1727.

On the other hand, in *Wyman v. James*, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971), the Supreme Court held that a warrantless home visit upon notice, undertaken by a caseworker employed by the state to determine continuing eligibility for benefits under the Aid to Families with Dependent Children program, did not violate the fourth amendment, because it was not a search. *Id.*, 400 U.S. at 318, 91 S.Ct. 381. In the alternative, the Court stated that even if the warrantless home visit did involve some elements of a search, it was not an unreasonable search, because (1) the public interest in the dependent child's needs were paramount to those claimed by the mother; (2) the state needed a "gentle means" of determining that the intended objects of the public assistance were the ones actually benefitting from it; (3) the home visit was part of an established routine that prohibited forced entry, visitation outside of normal business hours and snooping in the home; (4) the required information could not be obtained without a home visit; (5) the visit was by a caseworker and not by the police for criminal investigation purposes; and (6) a warrant

procedure would be "out of place." *Id.* at 318–19, 91 S.Ct. 381.

### 2.The Requirements of the Fourth Amendment in the Bankruptcy Context

This Court applies a similar balancing analysis in determining the requirements of the fourth amendment in the present context. The Court will first consider the interests of the trustee and the public in a trustee's inspection of a debtor's residence. Then the Court will consider the effects of such an inspection on the debtor and the debtor's reasonable privacy interests.

### (a) The Interests of the Trustee and the Public

Experience demonstrates that in carrying out the trustee's obligations under the Bankruptcy Code, the trustee may need to inspect a debtor's residence for property of the estate. This need may arise from the trustee's general statutory obligation to marshal and account for all property of the estate. 11 U.S.C. § 704; *Midway Airlines, Inc. v. Northwest Airlines, Inc. (In re Midway Airlines Inc.)*, 154 B.R. 248, 256 (N.D.Ill.1993). More particularly, such a need may arise when, as here, the trustee has reason to believe that there are undisclosed assets to be administered for the benefit of the estate. *See In re Washington*, 232 B.R. 814, 815 (Bankr. S.D.Fla.1999). This need may also arise when the trustee seeks to meet his burden of proof in objecting to the debtor's discharge or the debtor's exemptions. 11 U.S.C. § 704(6). *See, e.g., In re Gaines*, 106 B.R. 1008, 1013 (Bankr.W.D.Mo.1989), *rev'd on other grounds*, 121 B.R. 1015 (W.D.Mo.1990). *See also Payne v. Wood*, 775 F.2d 202, 206 (7th Cir.1985) ("The requirement that the debtor list the property serves at least two functions. One is to settle claims of title, so that on the day of discharge everyone knows who owns what. The other is to allow the trustee to decide which claims to challenge."); *Andermahr v. Barrus (In re Andermahr)*, 30 B.R. 532, 533 (9th Cir. BAP 1983).

■ As in *Camara*, the trustee may in some cases have no way to carry out his statutory obligation to account for all of the property of the estate without an inspection of the debtor's residence. Indeed, the present case is one such case. Given the bankruptcy process by which a debtor receives a discharge of debts in return for cooperating with the trustee, disclosing all assets and giving up all non-exempt assets, the trustee's inspection of the debtor's residence may, in a particular case, be a crucial part of the process and therefore a matter of substantial need.[11] Although most debtors may qualify as "honest but unfortunate," *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991); *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934), it must be recognized that "[d]ebtors are not perfectly trustworthy." *Payne v. Wood*, 775 F.2d at 206.

■ In this connection, the Court must further observe that there is a strong public interest in the full and proper administration of a bankruptcy case by a trustee, including a full investigation of the debtor's assets. *Dougherty v. Capitol Cities Communications, Inc.*, 631 F.Supp. 1566, 1571 (E.D.Mich.1986) (citing H.R.Rep. No. 95–595, 95th Cong. 1st Sess. 88 reprinted in U.S.C.C.A.N. 1978, 5787, 6050). Moreover, that public interest goes well beyond the private interests of the individual creditors whose claims are discharged through the process. *In re Daily Corp.*, 72 B.R. 489, 491 (Bankr.E.D.Pa.1987).

The Court further considers that, as in *Camara*, the trustee's inspection is not for the purpose of discovering evidence of crime, although presumably any such evidence will be turned over to the United States Attorney as required by 18 U.S.C. § 3057(a), or to the United States Trustee so that the United States Trustee can then notify the Unites States Attorney under 28 U.S.C. § 586(a)(3)(F).

The Court also concludes that a procedure for an inspection order in bankruptcy would be an ordinary part of the judicial and administrative processes of bankruptcy. Indeed, allowing trustees to perform inspections without a court order would be "out of place." *Cf. Wyman*, 400 U.S. at 324, 91 S.Ct. at 389.

(b) The Interests of the Debtor and Other Occupants

On the other side of the balance, there are several significant considerations. For example, the Court must consider that because the personal property of the estate that is the object of inspection may be anywhere in the debtor's residence, hidden in private places or in plain view, the trust-

---

11. The link between the trustee's access to information about the debtor's assets and the trustee's administration of the estate has been emphasized many times by the courts. "A debtor's complete disclosure is essential to the proper administration of the bankruptcy estate." *Cohen v. McElroy (In re McElroy)*, 229 B.R. 483, 488 (Bankr.M.D.Fla.1998). *See also In re Sochia*, 231 B.R. 158, 160 (Bankr. W.D.N.Y.1999). "The veracity of the [debtor's] statements is essential to the successful administration of the Bankruptcy Code." *Van Roy v. Watkins (In re Watkins)*, 84 B.R. 246, 250 (Bankr.S.D.Fla.1988) (citing *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir.1984)). "The obligation of full disclosure is crucial to the integrity of the bankruptcy process." *In re Hyde*, 222 B.R. 214, 218 (Bankr.S.D.N.Y.1998), *rev'd on other grounds*, 235 B.R. 539 (S.D.N.Y.1999) (citing *In re Wincek*, 202 B.R. 161, 166 (Bankr.

M.D.Fla.1996), *aff'd*, 208 B.R. 238 (M.D.Fla. 1996) ("[F]ull disclosure of all relevant information has always been an important policy of the bankruptcy laws.") (internal quotations and citations omitted) (alteration in original)). "[S]chedules are to be complete, thorough and accurate in order that creditors may judge for themselves the nature of the debtor's estate." *Garcia v. Coombs (In re Coombs)*, 193 B.R. 557, 563–64 (Bankr. S.D.Cal.1996) (quoting *Armstrong v. Lunday (In re Lunday)*, 100 B.R. 502, 508 (Bankr. D.N.D.1989)).

In *Fidelity Nat'l Title Ins. Co. v. Franklin (In re Franklin)*, 179 B.R. 913, 927 (Bankr. E.D.Cal.1995), the court stated that the debtor "elected not to perform his end of the 'bankruptcy bargain' by fully, candidly, and completely disclosing all his financial affairs and debts."

ee's inspection may well be highly intrusive, allowing the trustee at least the opportunity to observe personal matters that have no relevance whatsoever to the administration of the bankruptcy case. Indeed such matters may be personal not only to the debtor but also to others such as family members. The potential for such intrusions into the personal lives of debtors and others is of substantial concern in weighing the parties' interests under the fourth amendment.

Beyond that, a trustee's inspection will result in a significant disruption to the lives of everyone whose property is the object of the search, albeit perhaps a temporary one. Another consequence may well be a certain loss of personal dignity, which perhaps may not be as temporary.

### 3. The Constitutionally Required Process for Inspecting a Debtor's Residence

■■■ On balance, the Court concludes that in the process of requesting, obtaining and executing an inspection order in bankruptcy, the fourth amendment requires the following procedures:

(1) The trustee must file a written motion requesting an inspection order, setting forth the facts establishing that there is reason to believe that there is property of the estate on the premises to be inspected. The motion must set forth these facts in a detailed fashion so that the court can make an independent judgment on this matter.

(2) The motion should ordinarily be filed according to the regular motion process utilized by the court. In the Eastern District of Michigan, this process includes notice to the debtor and an opportunity to be heard under applicable local rules. *See* Local Bankruptcy Rule 9014–1 (E.D.Mich. 1998). Indeed this local rule requires that, at least in the context of an adversary proceeding, ordinarily the trustee should

first determine from the debtor's attorney whether the debtor will consent to the inspection order.[12] Local Bankruptcy Rule 9014–1(g). If the motion seeks ex parte relief, that is, an inspection order without prior notice, the motion must set forth detailed facts establishing the necessity for that relief.

(3) Unless the motion sets forth detailed facts establishing the necessity to conduct the inspection otherwise, the motion should ordinarily request authorization to conduct the inspection:

(A) during regular business hours;

(B) in the debtor's presence; and

(C) without forcible entry.

(4) The order must identify the premises to be inspected and contain factual findings in support of the court's decision to grant the inspection of those premises under paragraph (1), above, and additional findings in support of its decision to grant any of the additional relief under paragraphs (2) and (3), above.

### 4. The Debtor's "General Warrant" Argument

■■■ In describing these procedures, the Court must reject the debtor's argument that the order must specifically describe the estate property that is the object of the search, and that otherwise it is a prohibited "general warrant" or "writ of assistance." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 311, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1977). The difficulty with a general warrant is that it does not specifically describe the place to be searched or the thing to be seized, as required by the language of the fourth amendment. However, an inspection order that complies with the requirements set forth above will specifically identify the premises to be inspected, *and will not authorize any "seizure" of any property.* The sole purpose

---

12. Although this rule technically only applies in adversary proceedings, the Court certainly encourages the trustee in other contexts to consult with the debtor's attorney before filing a motion for an inspection order with a

view toward negotiating the terms of a stipulated inspection order. *Cf.* Local Bankruptcy Rule 2004–1 (E.D.Mich.1998) (requiring consultation before filing a motion for examination under FED.R.BANKR.P.2004).

and object of an inspection order is inspection. If the trustee seeks to take actual possession of any property, presumably the trustee will follow the established procedures for such a seizure, which may involve an injunction. *See* FED. R.BANKR.P. 7001(7) and 7065.

As noted above, in determining the constitutionally required procedures in these circumstances, the Court must balance the trustee's need for the inspection and the debtor's reasonable expectations of privacy. Certainly in many cases, the trustee has specific information suggesting that there is specific undisclosed estate property on the premises to be inspected.[13] But in many more cases, the trustee's investigation may suggest the existence of undisclosed property that the trustee simply cannot identify with particularity without the cooperation that a debtor is required by law to give.[14] In such a case, the trustee may properly feel compelled to inspect the debtor's residence.

Accordingly, the Court rejects the notion that the fourth amendment restricts a bankruptcy trustee to inspect only for specific property that the trustee has specific reason to believe is on the premises. Such a restriction ignores the practical realities that a trustee faces in the daily administration of bankruptcy and the reasonable inferences that can be drawn from those realities, as this case well demonstrates. Thus, such a restriction would unduly compromise the trustee's ability to carry out his statutory obligations and potentially reward the dishonest or sloppy debtor. The Court concludes that if the trustee establishes reason to believe that there are estate assets on the premises that the trustee proposes to inspect, the fourth amendment permits the trustee the oppor-

tunity to inspect those premises without restriction as to specific property, subject only to the procedures described above.

Having established the requirements of the fourth amendment in these circumstances, the Court must next address whether those requirements were met in this case.

### V. Applying the Constitutional Requirements in This Case

■ It must be concluded that in this case, the trustee's motion for an inspection order established more than ample reason to believe that there was property of the bankruptcy estate at the debtor's Milford residence. Indeed, the trustee did an extraordinary job of marshaling detailed facts establishing reason to believe that the debtor owned more than $500 worth of clothing, that both furniture and video machines owned by the debtor were at the residence and that both the debtor and Mrs. Barman lacked credibility and had been uncooperative. These facts clearly allowed Judge Shapero to make an independent determination, which he did in granting the inspection order. Having established reason to believe that there was estate property at the Milford residence, the trustee did not violate the debtor's fourth amendment protections in obtaining and executing an inspection order.

The motion further established the need for the inspection order to be issued without giving the debtor an opportunity to be heard. The detailed facts presented demonstrated an extended series of highly suspect transactions as well as hiding assets. The motion certainly provided sufficient reason to believe that in order to avoid irreparable harm to the estate, it was necessary to issue the order without notice. The trustee was justly concerned that a

---

**13.** Indeed, as developed more fully in part V., below, this is one such case. In this case, the trustee had specific information about undisclosed video machines and furniture in the Milford residence.

**14.** Again, as developed more fully in part V., below, this is one such case. In this case, the trustee's information suggested much more

undisclosed property than merely video machines and furniture. This debtor, after several recent cash transactions involving hundreds of thousands of dollars, disclosed in his bankruptcy schedules assets of only $500. These facts alone establish reason to believe that there was other undisclosed estate property in the residence.

---

hearing would take time to set up and that this debtor might take advantage of that opportunity to secrete estate property in frustration of the bankruptcy process. The Court concludes that the entry of the inspection order without notice to the debtor did not violate the debtor's fourth amendment rights.

Beyond that, the order provided that the inspection should commence during business hours (at 1 p.m.), and that if no one was available at the residence for the trustee to proceed, forcible entry could be attempted only upon the further order of the court. In fact, the inspection did commence at the stated time, and Mrs. Barman was available to permit the inspection without forcible entry and did so.

## VI. Conclusion

The Court concludes that the trustee acted entirely reasonably in obtaining and executing the inspection order in this case and that the debtor was afforded all of the protections to which he was entitled under the fourth amendment. There are no grounds to suppress evidence. The motion to suppress is denied.